1      IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF KANSAS
2                 TOPEKA, KANSAS

3

    UNITED STATES OF AMERICA        )
4   -------------------Plaintiff,   )
                                    )
5           vs.                     ) Case No.
                                    ) 05-40126-01
6   DIANA VELIA GUYTON,             )
    -------------------Defendant.   )
7

8

9

10    PARTIAL TRANSCRIPT OF JURY TRIAL CONSISTING OF

11         VOLUME I OF THE TESTIMONY OF

12              DIANA VELIA GUYTON

13                   BEFORE

14       HONORABLE RICHARD D. ROGERS

15                    on

16             August 28th, 2006

17

    APPEARANCES:
18  For the Government:    Mr. Gregory G. Hough
                           Asst. U.S. Attorney
19                         290 Federal Building
                           444 Quincy Street
20                         Topeka, Kansas   66683

21  For the Defendant:     Mr. Richard Jones
                           Jones Law Office
22                         1503 Southeast Quincy
                           Topeka, KS 66612
23

24  Court Reporter:        KELLI STEWART, RPR, CRR, RMR
                           Nora Lyon & Associates
25                         2300 S.W. 29th St., Ste 121
                           Topeka, Kansas   66611

I N D E X

Certificate-------------------- 106


W I T N E S S E S

ON BEHALF OF DEFENDANT:                        PAGE
DIANA VELIA GUYTON
Direct Examination by Mr. Jones                   3
Voir Dire Examination by Mr. Hough               19
Direct Examinatoin by Mr. Jones (Cont'd)         21


E X H I B I T S

| DEFENDANT EX. NO.: | OFFERED | RECEIVED |
|---|---|---|
| 4, 5 and 6 | -- | 67 |
| 11 and 12 | -- | 35 |
| 15, 16, and 17 | 17 | 18 |
| 18 | 19 | 21 |
| 19 | 22 | 22 |
| 20 | 27 | 27 |
| 21 | 29 | 29 |
| 22 | 51 | 51 |
| 23 | 53 | 53 |
| 24 and 25 | 63 | 67 |

(PLEASE NOTE:  When the Defendant answers in
English, "THE DEFENDANT" is placed in colloquy
in the transcript.  Otherwise all answers are
given through the interpreter).

1           (THEREUPON, the heretofore

2           proceedings were not ordered transcribed

3           until the following was had).

4

5           MR. JONES:  Next, Your Honor, I would

6     like to call Ms.-- Ms. Guyton to the stand.

7           THE COURT:  All right.  You may do

8     so.

9

10                DIANA VELIA GUYTON,

11     called as a witness on behalf of the Defendant,

12     was sworn, and testified as follows:

13                DIRECT EXAMINATION

14     BY MR. JONES:

15  Q.  Tell us your name.

16  A.  My complete name is Diana Velia Guyton-Chavira.

17           MR. HOUGH:  Judge, if I might, if the

18     interpreter could somehow situate that so that

19     microphone is closer to his mouth, like move it

20     up vertical a little bit there so that he

21     projects to everyone.  Thank you.

22           MR. JONES:  All right.  Mr.

23     Interpreter, if you wanted to stand behind her

24     and put the mike back there like Mr.--

25           MR. HOUGH:  Jesse.

1           MR. JONES:  Mr. Ybarra.  Like Mr.

2      Ybarra did, that would be fine.  Am I in your

3      way?

4           MR. HOUGH:  You're okay, I can get

5      here.  There's a reverberation in some

6      microphone in here, I don't know what it is.

7   Q.  (BY MR. JONES)  What's your address, ma'am?

8   A.  It's 32nd Street Southwest, 5316.

9           THE DEFENDANT:  33rd.

10  A.  33rd Street.

11  Q.  (BY MR. JONES)  Okay.  And what is your marital

12      status?

13  A.  I'm a single mother, divorced.

14  Q.  Since when?

15  A.  Since six years ago.

16  Q.  You have children?

17  A.  Four children.

18  Q.  What do your children do?

19  A.  The oldest is married, he's a salesperson.  And

20      twins, they're in the last year of preparatory,

21      which is high school.

22  Q.  And the fourth?

23  A.  And the youngest is in the second year, which

24      is the ninth, which is secundario, which is

25      middle school.

```
1    Q.  You have three brothers; Samuel, Oliver, and

2        Normando?

3    A.  Yes.

4    Q.  And where do your brothers live?

5    A.  My brother, Samuel, lives in Grand Bend.

6                   THE DEFENDANT:  Great Bend.

7                   INTERPRETER BRACAMONTE:  Great Bend,

8        Kansas.

9                   THE DEFENDANT:  Great Bend.

10                   INTERPRETER BRACAMONTE:  Great Bend.

11   Q.  (BY MR. JONES)  And the others?

12   A.  Lyon-- my brother, Oliver, lives in Lyon,

13       Kansas.  And my brother, Normando, lives in

14       Dodge City, Kansas.

15   Q.  Uh-huh.  What do you do for a living?

16   A.  I'm a pediatric nurse, licensed.

17   Q.  Do you speak English?

18   A.  Yes.

19   Q.  Why did you ask the Court to bring an

20       interpreter for you in this case?

21   A.  I can understand English enough for daily life

22       and also in my job, but I want to make sure

23       that I understand the legality, the terminology

24       in court.

25   Q.  Is there a concern that you have about legal
```

1       terms in the court that-- that caused you to

2       make that request?

3   A.  Yes.  Because during my divorce--

4               MR. HOUGH:  Judge, we'll object.  She

5       has counsel, she has an interpreter and any

6       concern about legal terms has been addressed.

7       This testimony about legal terms in her divorce

8       would be subject to Rule 403.  It would also be

9       irrelevant.

10              THE COURT:  Tell me again your

11      objection.

12              MR. HOUGH:  That her testimony about

13      some concern about legal terms in this

14      courtroom as a result of her divorce proceeding

15      would be-- first of all, it's been addressed by

16      the Court with an interpreter and competent

17      counsel.  So this testimony would be subject to

18      Rule 403.  And additionally, it would be

19      irrelevant.

20              THE COURT:  Mr. Jones.

21              MR. JONES:  Your Honor, I-- I think

22      it's-- I think it would be an obvious question

23      for-- for the jury why somebody who can work

24      every day as a-- as a nurse-- I wasn't going

25      very far with it, I just wanted to figure out

1      why-- why she was-- had that concern in this

2      particular case.

3              THE COURT:  Well, I'll overrule the

4      objection and allow you to go ahead and present

5      your testimony the way you want to.

6   A.  During my divorce there were many legal

7      terminology things that I did not quite

8      understand.  I did not have an interpreter,

9      which caused unfavorable things toward my

10     family.

11  Q.  (BY MR. JONES)  In your job, is your level of

12     English sufficient to take care of your

13     patients?

14  A.  Yes, it is.

15  Q.  Are you certified by any state regulatory

16     agency?

17              INTERPRETER BRACAMONTE:  I'm sorry,

18     counsel.

19  Q.  (BY MR. JONES)  Are you certified by any state

20     regulatory agency?

21  A.  Yes.  I do have a certificate of nurses.

22              THE DEFENDANT:  Board of Nursing.

23              INTERPRETER BRACAMONTE:  By the Board

24     of Nursing.

25  Q.  (BY MR. JONES)  Before we get into other areas,

1       I want you to tell the jury what was happening

2       during the time that the mayor testified that

3       he felt insulted.

4   A.  Why, specifically why he was-- he felt

5       insulted?  I don't know.  But I can ask the

6       members of the jury and everybody that's here

7       to remember--

8               MR. HOUGH:  Judge, we'll object to

9       this.  This is inappropriate comment to the

10      jury on matters outside of relevancy and

11      outside of--

12              THE COURT:  Yeah, I-- I don't think

13      she should be asking the jury to do any

14      particular thing here.

15  Q.  (BY MR. JONES)  Don't address yourself to the

16      jury, I just want you to-- I just want you to--

17      to tell me what was happening when that the--

18      at the time that the mayor indicated that he

19      felt that you had insulted him.

20  A.  The mayor mentioned a saying, a Mexican saying

21      which is the toad, which is the stone.

22              THE DEFENDANT:  The size of the toad,

23      the size of the stone.

24              INTERPRETER BRACAMONTE:  That when

25      spoken in English-- can-- can she say again

1      what she said?

2                THE DEFENDANT:  According to this, to

3      the size of the toad, the size of the stone.

4  A.  So my attorney, he's not familiar with those

5      kind of sayings from Mexico.  So I was

6      explaining to him that in Mexico the children,

7      the young people, they like to kill toads with

8      stones.  And, of course, if they find a small

9      toad, they just need a small stone.  But if

10     they find a bigger toad, then they need a

11     bigger stone.  That's the only thing I

12     explained to my attorney.

13 Q.  And while we're talking about threats, please

14     tell me what you know about a family called--

15     by the name of Carrasco who the-- the professor

16     indicated had invited him to dinner.

17 A.  Carrasco in Mexico, that's a common last name.

18     But personally I don't know and I don't have no

19     interaction with that last name.

20 Q.  Who from Ojinaga have you talked to about

21     what's going on in this case?

22 A.  When my attorney received a written report of a

23     Mrs. Angelita Munoz, which she was one of the

24     Civil Registry secretaries, and I read it and I

25     found out that he was-- that my husband was one

1       of the students--

2               THE DEFENDANT:  Her husband.

3               INTERPRETER BRACAMONTE:  That her

4       husband was one of the students--

5               THE DEFENDANT:  Was one of the

6       teachers.

7               INTERPRETER BRACAMONTE:  One of the

8       teachers.

9    Q.  (BY MR. JONES)  So you-- you read her

10      statement?

11   A.  Yes.

12   Q.  And-- and in her statement she indicated that

13      her husband had recently passed away?

14   A.  Effectively.  I called her, which is the

15      godmother of my--

16              THE DEFENDANT:  Twin son.

17   A.  Of the twin son, just to say feeling sorrow

18      about the-- about her husband.

19   Q.  (BY MR. JONES)  And that husband of hers

20      happened to be an ex-teacher of yours?

21   A.  Yes.

22   Q.  And have-- was-- was Professor Benitez, the guy

23      who felt insulted, was he a former teacher of

24      yours?

25   A.  Yes, I knew Professor Benitez when I was in

1       fifth grade in primary.

2   Q.  Okay.  And what school were you attending at

3       that point?

4   A.  The school Plan, Chihuahua.  And I've known the

5       professor since I was eleven years old.

6   Q.  Who are your parents?

7   A.  Samuel Ross Guyton, the one that passed away,

8       and Mrs. Alicia Chavira Guyton.

9   Q.  Are you certain that Samuel Guyton is your

10      father?

11  A.  Absolutely.

12  Q.  Do you have any memories of your father at an

13      early age?

14          INTERPRETER BRACAMONTE:  I'm sorry,

15      counselor.

16  Q.  (BY MR. JONES)  Do you have any memories of

17      your father when you were at a very early age?

18  A.  Many.

19  Q.  Tell me the earliest memory that you have of

20      your father.

21  A.  The earliest that I remember my father, I was

22      around two or three years of age.  I-- I

23      remember this because the youngest of the

24      sister of my mother, it's only a

25      year-and-a-half younger than I, and she was

1    barely starting to walk.  We were in bed

2    playing with my father, he was tickling all the

3    children, and then I-- I discovered that the

4    belly button on my father was very deep.

5  Q.  Okay.  And so-- so you, your aunt and your

6    father were playing in the bed?

7  A.  Yes.

8  Q.  And your-- your aunt is younger than you?

9  A.  A year-and-a-half.

10  Q.  Tell-- tell the jury of some more-- of some

11    other memories you have with your father after

12    that and before you started school.

13  A.  I can mention that on one occasion my father

14    gave me a coat, a coat which had a number

15    three.

16              THE DEFENDANT:  Size 3.

17  A.  Which was size 3.  And I was so small that I

18    used that coat all the way till I was four to

19    five years old.  And that coat, the color was a

20    gray and white.  And a friend of my father in

21    Mexico, he would always joke and he would make

22    me upset, telling me how many cats did I kill

23    to make that coat.

24  Q.  (BY MR. JONES)  Okay.  Tell us something that--

25    that-- about any special time that you spent

1    with your father after you started school.

2  A.  My father will always take me to buy my school

3    supplies.  We were always together.  He always

4    talked about me coming to study in the United

5    States when I was going to start secondary.

6        THE DEFENDANT:  Middle school.

7  A.  Which is middle school.  He brought me a

8    typewriter.  We were always together.  We would

9    always go in the evening to have ice cream.

10    And Mom would get upset because he should be on

11    a diet.

12  Q.  (BY MR. JONES)  Did he take you other places

13    besides to the ice cream parlor?

14  A.  Yes.  Before I started school, primario, we

15    would go to the other side, Presidio, American

16    side every Sunday to have coffee and to talk

17    with his friend.  And I would drink very hot

18    chocolate.  So by the time my chocolate turned

19    cold, Dad would have already three cups of

20    coffee.

21  Q.  When you were a child, where did you guys buy

22    your groceries and your household products and

23    things like that?

24  A.  The supermarket, Atera (phonetic), in Presidio,

25    Texas.  Father and I, we would go in the

1      morning or in the afternoon to go buy groceries

2      for Mom.

3  Q.  When-- when you crossed the-- the border as a

4      child to go buy groceries, did they ever ask

5      you for any-- any documentation?

6  A.  No.  My father would speak to the officer in

7      English.  He would say, "this is my daughter,"

8      and the officer would wave to me, Spanish very

9      limited, indicating that my father had told me,

10     "that's my daughter."  And we would cross.

11 Q.  Did your--

12             MR. JONES:  Your Honor, I didn't know

13     whether-- what time you'd like to take your

14     morning recess, but she'll be on here for a

15     while.  So let me know when you want me to

16     stop.

17             THE COURT:  Well, we might take it

18     right now, it's a quarter to eleven, and then

19     we'll come back.  All right.  Ladies and

20     gentlemen, let's take about a 15-minute recess

21     and then we'll come back.  Mr. Bailiff.

22             (THEREUPON, a recess was had).

23             THE COURT:  Mr. Jones, before you

24     proceed let me read that limiting instruction

25     we-- we talked about.

1          Members of the jury, a witness, Mr.

2     Kanatzer, has testified and a chart was

3     presented, the last witness for the Government,

4     which has attempted to summarize in a

5     chronological fashion some of the evidence

6     which has been presented in this case.  You

7     must be advised and know while you may consider

8     the witness' testimony and the chart, neither

9     one is binding on you in any way.  You are the

10     judges of the facts in this case.  It is your

11     recollection of the evidence and if it is

12     different than the summary given by the witness

13     or listed on the chart, or if your review of

14     the testimony and the exhibits lead to a

15     different conclusion, then that recollection

16     is-- or conclusion must control.  The chart

17     itself is not evidence or proof of any facts,

18     it is merely submitted to help explain the

19     evidence in this case from the Government's

20     perspective.  And please remember that.

21          All right.  Mr. Jones.

22  Q.  (BY MR. JONES)  When did you first learn to

23     write?

24  A.  I was six years old.

25  Q.  Did you learn to write at home or in school?

1    A.   School.

2    Q.   And at what age did you learn how to write your

3         name?

4    A.   Six years.

5    Q.   And when they taught you to write your name,

6         how did you-- how did-- or what exactly was

7         written on the page?

8    A.   Diana Velia Guyton-Chavira.

9    Q.   Did that first and last name cause any-- any

10       concern or speculation amongst your-- your

11       cohorts there in-- in the school?

12    A.   Not precisely about interest but not able to

13       pronounce the name.

14    Q.   Did-- the students or the teachers?

15    A.   Students, teachers, they not pronounce my last

16       name correctly.

17    Q.   And if-- if somebody were to try to pronounce

18       your name phonetically in Spanish, how would--

19       how would it sound?

20    A.   Gwee-ton.

21    Q.   In order to save a little time, I'm going to

22       hand you what's been marked for identification

23       as Defendant's Exhibits 15, 16 and 17.  I want

24       you to look those over and let me know when

25       you've had a chance to see them.  Can you tell

1        me-- can you tell the Court what No. 15 is?

2        The number is on the back.

3  A.  That's my report card of second grade of

4        secundario, which is middle school.

5  Q.  And if we started with-- with number-- with the

6        first grade being number one and the first year

7        of school, where would the second year of

8        middle school be, what grade would that be?

9  A.  Second grade in Mexico, here it would be eighth

10       grade.

11  Q.  Okay.  And so that 15 is your eighth grade

12       report card?

13  A.  Yes.

14  Q.  And what is No. 16?

15  A.  Ninth grade, that's the report card.

16  Q.  And what name is-- is-- are those report cards

17       in?

18  A.  Guyton-Chavira, Diana Velia in both of them.

19  Q.  And No. 17, what is-- what is that document?

20  A.  That's my certificate of graduation of

21       preparatorio, which is high school.

22  Q.  And what name is it in?

23  A.  Guyton-Chavira, Diana Velia.

24          MR. JONES:  I would offer Defendant's

25       Exhibits 15, 16 and 17.

1           MR. HOUGH:  We would submit they're

2      irrelevant, Judge.

3           THE COURT:  Well, 15, 16 and 17 will

4      be admitted into evidence.

5  Q.  (BY MR. JONES)  I'm going to hand you what's

6      been marked for identification as Defendant's

7      Exhibit 18.  Would you look that over for me

8      and tell me what it is.

9  A.  This is a baptismal certificate.

10 Q.  And baptism certificate for whom?

11 A.  Diana Velia.

12 Q.  And the-- it says Diana Velia, does it have a--

13     a last name connected with it?

14 A.  It only says-- that's on the margin.

15 Q.  Diana Velia?

16 A.  Diana Velia.

17 Q.  Does it-- and what does it mean by on the

18     margin, if you know?

19 A.  That's the person that's been baptized.

20 Q.  And does it tell what date you were baptized?

21 A.  October 19th, '65, that's the date.

22 Q.  What date does it-- does it state that Diana

23     Velia was born?

24 A.  July 14th, '65.

25 Q.  Does it say where Diana Velia was born?

1   A.  Cuidad, Ojinaga.

2              THE DEFENDANT:  Ojinaga.

3   A.  Ojinaga, Chihuahua.

4   Q.  (BY MR. JONES)  Does it indicate who the

5       parents of the-- of the baptized child is?

6   A.  Samuel Ross Guyton, Alicia Chavira.

7   Q.  I won't go through them all, but does it

8       mention the-- the names of the grandparents on

9       both sides?

10             MR. HOUGH:  Judge, we'll object to

11      her reading from the document unless it's been

12      admitted in court.  It hasn't been offered and

13      I haven't seen that yet.

14             THE COURT:  Okay.  I think that would

15      be proper to handle it that way.

16             MR. JONES:  All right.

17             MR. HOUGH:  May I see it?

18             MR. JONES:  I would like to offer

19      Exhibit No. 18, Your Honor.

20             MR. HOUGH:  May I see it?  Judge, may

21      I ask voir dire, please?

22             THE COURT:  Yes, you may.

23             VOIR DIRE EXAMINATION

24      BY MR. HOUGH:

25  Q.  Ma'am, the bottom of this document indicates

1      that it's executed April the 24th of 1990; is

2      that correct?

3  A.  That's the date--

4            INTERPRETER BRACAMONTE:  If I can

5      inquire of the witness about a word.

6  A.  That's the date that this document was

7      proportioned.

8            THE DEFENDANT:  Provided.

9            INTERPRETER BRACAMONTE:  The witness

10     says provided.

11  Q.  (BY MR. HOUGH)  So that the actual date of this

12     document then is April 24 of 1990.  Correct?

13  A.  The date April 24th, '90, that's when the

14     parochial saw this document and that's when he

15     dated it.

16  Q.  So-- and that was the date that it was issued.

17     Correct?

18  A.  That's correct.

19  Q.  And that person is-- what's that name there at

20     the bottom?

21  A.  Reverend Adrian Miguel Bejarano.

22           THE DEFENDANT:  B-E-J-A-R-A-N-O.

23  Q.  (BY MR. HOUGH)  And what was the purpose in

24     1990 of you obtaining the document?

25  A.  Mother obtained this.

1   Q.  Thank you.

2           MR. HOUGH:  I have nothing further.

3  No objection to it, Judge.

4           THE COURT:  Did he say he had no

5  objection?

6           MR. JONES:  He said no objection.

7           THE COURT:  All right.  And what was

8  the number of that?

9           MR. JONES:  18.

10          THE COURT:  18 will be admitted.

11              DIRECT EXAMINATION

12  BY MR. JONES:  (Continued)

13  Q.  Without reading all of the-- the-- the

14     grandparents on both the father and mother's

15     side, do they appear to be correct as you

16     understand who your grandparents are?

17  A.  Effectively, yes.

18  Q.  Are-- are those people listed on there, are

19     those your grandparents?

20  A.  Yes.

21  Q.  I hand you what's been marked for

22     identification as Defendant's Exhibit No. 19.

23     Are you familiar with-- with that-- that

24     photograph?

25  A.  Yes.

1   Q.  And can--

2                MR. JONES:  Just a moment.

3   Q.  (BY MR. JONES)  What-- what is depicted in

4       Defendant's Exhibit No. 19?

5   A.  That's the parochial of Jesus of Nazareth.

6   Q.  Okay.  And what is that-- is that the same

7       parroquial, Jesus of the Nazarene, where you

8       were baptized?

9   A.  Yes.

10               MR. JONES:  Judge, I would like to

11      offer exhibit-- Defendant's Exhibit No. 19.

12               MR. HOUGH:  Judge, we'd submit it's

13      irrelevant.

14               THE COURT:  Well, I-- I will admit

15      19.

16               MR. JONES:  And may I publish it?

17               THE COURT:  Yes, you may.

18  Q.  (BY MR. JONES)  I guess that square that's

19      showing up behind it is the exhibit number but

20      is-- is this door the entrance to the church?

21  A.  Yes.

22  Q.  As you got older, did you learn that your

23      father had some health problems?

24  A.  Yes.

25  Q.  And how did you find that out?

1   A.   My father suffered--

2                  THE DEFENDANT:  Heart attack.

3   A.   Heart attack.

4   Q.   (BY MR. JONES)  And at some point did you learn

5        that he had applied for-- for Social Security

6        disability benefits?

7   A.   Yes.  Yes, after he suffered a heart attack.

8   Q.   Did you learn at some point that your father

9        had applied for-- for Social Security numbers

10       for you and your brothers?

11  A.   Yes.

12  Q.   Tell me what-- what you remember about-- about

13       the application for Social Security for you.

14  A.   Father was filling out the documents and he

15       told me that I needed to sign in a certain

16       place, but I did not know what I was about

17       signing, so he showed me how to write my name

18       in handwriting.

19                 THE DEFENDANT:  In cursive.

20                 INTERPRETER BRACAMONTE:  Cursive.

21  A.   So I could write it that way.

22  Q.   (BY MR. JONES)  Did you-- did you practice it

23       or did he help you practice it?

24  A.   Father helped me.

25  Q.   What was the last-- let's-- let's talk about

1      one of the last things that you remember that--

2      that your father and you engaged in so we won't

3      wind up spending too much time on that.

4  A.  I don't understand your question.

5  Q.  When-- when you and I were talking, you told me

6      about one of the last projects that your father

7      worked on.  And I just want you to explain that

8      to the jury and then we can move on to some

9      other areas.

10  A.  Well, it could be when we were working in the

11      house that my father built for us.

12  Q.  That's what I was talking about.  Explain--

13      explain that, what you--

14  A.  As I told you before, my father built that

15      house.  My father, with his hands, he put like

16      part of the thing from the--

17          MR. JONES:  Sheetrock.

18          THE DEFENDANT:  Sheetrock.

19  A.  The sheetrock on the roof and I helped him.

20      And he was taking measurements and I would

21      write down what he told me.

22  Q.  (BY MR. JONES)  You-- you said that your father

23      putting sheetrock, was it on the roof or on the

24      ceiling?

25  A.  The ceiling, inside the house.

1    Q.   Okay.

2    A.   Also my father built the inside kitchen of my

3         house.

4    Q.   When you say built the inside kitchen, are you

5         talking about the walls or-- or the cabinets or

6         what?

7    A.   Cabinets.

8    Q.   How-- how much of the work on the house did

9         your father do?

10   A.   A lot.  The walls and the roof, and someone

11        else.

12   Q.   Say that to me again.

13   A.   A bricklayer is the one that built the walls,

14        the floor and the roof.

15   Q.   Okay.

16   A.   And my father is the one that put the

17        sheetrocks on the roof and also built inside

18        kitchen and also he built the closets so we can

19        put clothes away.  And we painted the house.

20   Q.   When you say we painted the house, what did

21        this ten- or eleven-year-old girl do?

22   A.   Father and I, we would do everything together.

23        I would help getting the paint ready, take

24        notes, take him nails, and also to hand to him

25        the measuring tape to be able to put the

1       sheetrocks.  My father was very strong.  And as

2       he would put a nail of three inches just with a

3       stroke of two or three, he would nail it down.

4  Q.  Do you remember ever having gone to Odessa,

5       Texas?

6  A.  My father-- after he went to the hospital when

7       he suffered heart attack.

8  Q.  And tell the jury what you remember about going

9       to Odessa when your father had his heart

10      attack.

11  A.  I remember spending a lot of time in the

12      hospital.  And my brothers and I were not

13      allowed to go into the room, but I was able to

14      see my father through the window.  He would

15      come to the window as we were outside the

16      building to see us.

17  Q.  Your mother was with you?

18  A.  Yes.

19  Q.  And she would go into the room and see her

20      husband?

21  A.  Yes.

22  Q.  And when you were not in the hospital and when

23      your mother was busy with her husband, what--

24      what did you do there in Odessa?

25  A.  We would stay at Grandmother's house.  She

1          allowed us to sleep, which was my father's bed.

2          And also we spent time at my aunt's house, Ina.

3          And she-- my brothers and I, we would take

4          breakfast to my--

5                    THE DEFENDANT:  Lunch.

6     A.   Or lunch to my uncle at his workplace.

7     Q.   (BY MR. JONES)  I hand you what's been marked

8          for identification as Defendant's Exhibit

9          No. 20.  Do you recognize that picture?

10    A.   Yes.

11    Q.   What is depicted in-- in that picture?

12    A.   This is a photo of me when we went that

13         occasion to Odessa.  I'm holding my cousin

14         Kimberly, daughter of Ina.

15                   MR. JONES:  I offer Defendant's

16         Exhibit No. 20.

17                   MR. HOUGH:  Your Honor, we'd submit

18         it's irrelevant.

19                   THE COURT:  Say that again.

20                   MR. HOUGH:  We would submit that it

21         is irrelevant.

22                   THE COURT:  Well, what's the number

23         of it?

24                   MR. JONES:  20.  20.

25                   THE COURT:  20 will be admitted.

1          MR. JONES:  May I publish it, Your

2      Honor?

3          THE COURT:  Yes, you may.

4   Q.  (BY MR. JONES)  This is-- is your-- your

5      cousin, Kimberly?

6   A.  Yes.

7   Q.  And this is you?

8   A.  Yes.

9   Q.  Is this the same little girl who's in the

10      picture with your grandmother, Goldia, in the

11      other exhibit?

12   A.  The same.

13   Q.  Were you an employee of the city of Ojinaga,

14      Chihuahua, Mexico?

15   A.  Yes.

16   Q.  Describe for the jury what your job was as an

17      employee of the city of Ojinaga, Chihuahua,

18      Mexico.

19   A.  My position was executive secretary for the

20      mayor.  And under my responsibility, first of

21      all, I received all incoming calls in the

22      building, organized the president's agenda, or

23      mayor, and received the people that needed to

24      speak to the mayor.  Organized the mayor's

25      trips, take notes of the mayor, writing,

1    typewriter of the mayor, and also to write

2    official documents for the main officer, for

3    the secretary of the city, for the secretary of

4    rural--

5              THE DEFENDANT:  Rural development.

6              INTERPRETER BRACAMONTE:  Development.

7    A.  Also under my responsibility to write letters

8    of recommendation, and also under my

9    responsibility to take fingerprints.

10   Q.  (BY MR. JONES)  I'm going to hand you what's

11   been marked for identification as Defendant's

12   Exhibit No. 21.  Can you tell the jury what's

13   depicted in that picture?

14   A.  That's the picture where the City Hall was

15   located.

16             MR. JONES:  Offer Defendant's Exhibit

17   No. 21.

18   Q.  (BY MR. JONES)  Is-- is this where you worked?

19   A.  Yes.

20             MR. HOUGH:  No objection.

21             THE COURT:  21 will be admitted.

22             MR. JONES:  May I publish, Your

23   Honor?

24             THE COURT:  Yes, sir.

25   Q.  (BY MR. JONES)  As the picture is situated

1  here, it-- is this the front of the building or

2  the back?

3  A.  Front.

4  Q.  I'm going to put my hand right there, would

5  that be the front door or-- or there?

6  A.  Yes.

7  Q.  Which one, here?

8           THE DEFENDANT:  Can you tell me how

9  to remove that?

10          (THEREUPON, the Defendant and the

11             courtroom deputy have a discussion

12             outside of the hearing of the reporter).

13  Q.  (BY MR. JONES)  Is the front door in the

14  middle?

15  A.  It's in the middle.

16  Q.  Okay.  And are there offices on-- on the first

17  floor and the second floor or not?

18  A.  A majority of them on the second floor and one

19  of the departments on the first floor.

20  Q.  Is that building a rectangle or a square?

21  A.  It is square.

22  Q.  I would like for you to-- to--

23           MR. JONES:  This is an erasable

24  chalkboard?

25           COURTROOM DEPUTY HILL:  It's dry

1    erase.

2  Q.  (BY MR. JONES)  I would like for you to step

3      over here and use big squares and-- and tell us

4      what's-- what's situated on each of those two

5      floors.

6  A.  This is the first floor.  This is the entrance

7      to the building.  This is the department of

8      land-- land and construction.  Here's some

9      office space for attorneys.

10 Q.  Would that be attorneys who worked for the city

11     or are those rented to a private attorney?

12 A.  Private attorneys.  And here's the post office

13     office.  And here's a copy place.  And here's

14     the department where you have titles for

15     property.  Public restrooms.  Here's the office

16     of Director of Employee Protection.  And here's

17     steps to go to the second floor.

18         This is second floor.  Here is the steps.

19     And here's the office of rent collection.

20             INTERPRETER BRACAMONTE:  I don't

21     understand that word.

22             MR. JONES:  It would be like the

23     counsel office.

24 A.  Here's office space for counsel.  Here's the

25     office for urban development.

1          MR. JONES:  Rural.

2          THE DEFENDANT:  Rural.

3          INTERPRETER BRACAMONTE:  Rural

4     development.

5  A.  This is the mayor's restroom.  Here's the

6     department of engineering.  And here's Civil

7     Registry.  Here's the treasurer.  Here's the

8     department of--

9          MR. JONES:  Livestock.

10  A.  Livestock.  Here's my desk.  Here's the mayor's

11     office.  And here's the office of a main

12     officer.  And here's the office of--

13  Q.  (BY MR. JONES)  Could you repeat that again?

14  A.  This is the office--

15          INTERPRETER BRACAMONTE:  The

16     interpreter wrote that word somewhere.

17          MR. JONES:  That would be the

18     counsel's-- secretary for the counsel.

19  A.  Secretary of the counsel.  Here's a waiting

20     room for people that go see the mayor.

21  Q.  Does that pretty well fill in the--

22  A.  And here's the juridis coat.

23          THE DEFENDANT:  The court.

24          INTERPRETER BRACAMONTE:  The court.

25  Q.  (BY MR. JONES)  What did you write down there

1      at the last?

2   A.  That's the waiting room of--

3   Q.  Is that the counsel's room?

4   A.  Counsel room.

5   Q.  Does that complete what-- what offices or

6      principal things that are in that building?

7   A.  Up to that I can remember, yes.

8   Q.  Okay.  In one little corner you have a-- a

9      little-- where your desk is, point to that.

10  A.  (Complied with counsel's request).

11  Q.  Were you sitting in a corner?

12  A.  Here.

13  Q.  And the-- okay.  The open area in the same room

14     where that-- where you indicated the-- the

15     executive secretary's desk is, what was in--

16     what was in that room or is that a room?

17  A.  That's the secretary of counsel.

18  Q.  This area that I'm pointing to here, is that a

19     room?

20  A.  You could say that.

21  Q.  Were there chairs there?

22  A.  During that time I worked there, no.

23  Q.  If someone called for anybody in this office,

24     this office, this office, this office, this

25     office, that office or any of the offices on

```
 1        the second floor, where would those calls come
 2        to?
 3   A.   To me.
 4   Q.   And if you were not at your desk when the phone
 5        would ring, what would happen to the calls?
 6   A.   They would just ring, ring, ring.
 7   Q.   Is-- is your-- which one of these rooms did you
 8        say was the waiting room where the people wait
 9        for the mayor?
10   A.   (Indicating).
11   Q.   People would wait in here?
12   A.   (Nods head up and down).
13   Q.   And what is this room between the waiting room
14        and the mayor's office?
15   A.   It's just a waiting room.  There you would
16        classify it in a way who was going to see first
17        the mayor.
18   Q.   And so even though there weren't two rooms
19        there, the people who were going to see the
20        mayor first would be on this side of the room?
21   A.   Yes.
22   Q.   And the ones who were not as urgent would sit
23        over on this side?
24   A.   Yes.
25   Q.   And who would decide that?
```

1    A.   The secretary of counsel.

2    Q.   You can take your seat back.  Did you ever work

3         in the-- in the office of Civil Registry?

4    A.   No.

5              MR. JONES:  Can I have those that

6         were No. 4, 5 and 6 that were not admitted yet

7         or were not admitted?

8              THE COURT:  Whenever you find a

9         breaking point, let's take a noon recess.

10             MR. JONES:  This would be fine, Your

11        Honor.

12             THE COURT:  All right.  Ladies and

13        gentlemen, I think we'll take a noon recess at

14        this time.  Let's-- let's recess until about

15        1:15 and we'll come back at that time.

16             Let me tell you one other thing.  Earlier

17        this morning in your absence I had a discussion

18        with the attorneys about Exhibits 11 and 12,

19        which we had some discussion on yesterday and

20        some more discussions today.  I have now

21        determined to admit Defendant's Exhibits 11 and

22        12, and they will be-- go to your jury room

23        with you.  So 11 and 12 will be admitted.  All

24        right.  Mr. Bailiff, let's recess the Court.

25             (THEREUPON, a luncheon recess was had).

1          THE COURT:  All right.  We're all

2     present, you may call your-- go ahead continue

3     your--

4          MR. JONES:  Can I have just a second

5     with you and Mr. Hough?

6          THE COURT:  Yes, sir, take your time.

7          (THEREUPON, the following

8            proceedings were held at the bench and

9            outside of the hearing of the jury).

10          MR. JONES:  Your Honor, Exhibits 4, 5

11     and 6 are the documents that-- that I attempted

12     to make-- to introduce through Professor

13     Benitez and he indicated that the documents

14     were stolen.  At this point I would like to--

15     to try to get a foundation for those documents

16     with Ms. Guyton to try to re-introduce them.

17     But I wanted-- wanted to-- wanted to give the

18     Court a heads-up so it wouldn't look like I was

19     trying to defy an order that the Court made on

20     their admissibility.

21          MR. HOUGH:  Judge, we appreciate

22     counsel doing that.  Given the Court's-- given

23     the testimony that these are documents stolen

24     from a foreign sovereign and the Court's ruling

25     that they're not admissible in this court, we'd

1        ask the Court to reaffirm them. And we would

2        ask counsel-- ask that the Court instruct

3        counsel to admonish the witness not to refer to

4        them during this testimony. It would be highly

5        unusual and irregular for the Court to allow

6        documents that the evidence shows were stolen

7        from a foreign sovereign to be admitted in this

8        case.

9        MR. JONES: And my suggestion is that

10       if I-- in order to show the basis of-- of where

11       she got the documents, and it would be clear

12       from her testimony that the documents were not

13       stolen, and I think that they are relevant

14       and-- and they show the division of-- of the

15       departments there in-- in Ojinaga. And

16       before-- before mistakenly publishing them or

17       anything like that, I will-- I would want to

18       get a clear basis for the foundation of them.

19       And that's all I want to do at this point and

20       then I'll offer--

21       THE COURT: Refresh my memory what

22       these documents were.

23       MR. JONES: They're payroll records.

24       THE COURT: What?

25       MR. JONES: Payroll records.

1           MR. HOUGH:  They're the actual

2      original payroll records.

3           MR. JONES:  They're not original,

4      they're not original.

5           MR. HOUGH:  The mayor testified

6      they're the actual original payroll records

7      from the period of time during his

8      administration which had been stolen from the

9      government.  He was asked specifically about

10     the certifications on the documents during my

11     voir dire, he was asked specifically about the

12     signatures on the documents.  He identified

13     those as the documents that were missing, that

14     had been stolen from the government during the

15     period of his administration.

16          MR. JONES:  And, Your Honor, I-- I

17     would-- I would like to be able to have Ms.

18     Guyton have her testimony, because I think it

19     will clear up the matter showing that they are

20     not stolen, that they are not originals, that

21     they are-- are documents that she was given at

22     the point where she was resigning from the

23     government.  And they've been in her archives

24     since she-- since she left the government in

25     1991.  And they've been in my office since

1   October when-- when these charges were brought

2   up.

3            MR. HOUGH:  Judge, they were shown to

4   the mayor.  There's the mayor's name right

5   there at the top of each one of the documents.

6   The Court's entertained this, the Court has

7   ruled, the ruling is correct.  We'd ask the

8   Court to reaffirm that ruling and to keep this

9   matter out of the presence of the jury.

10           THE COURT:  Did she have these

11  documents?

12           MR. JONES:  She's had these documents

13  since 1991, July.

14           THE COURT:  Where did she get them?

15           MR. JONES:  This is a copy of the

16  documents that they gave her when she was--

17  when it was time for her to resign and for her

18  to get her severance pay.  They give severance

19  pay.  And so in order to get the severance pay,

20  you have to be able to take the last three

21  months of your work and take it to a certain

22  area and they-- and they figure your severance

23  pay.  Those-- those are her last three months

24  up to that time and she took it there and got

25  her severance.  And that's what she's going to

1    testify to.

2              MR. HOUGH:  Judge, she can testify

3    generally to those matters without the

4    documents.  The documents were identified by

5    the former mayor as stolen, that those were the

6    documents from his administration, they were

7    stolen.  And in truth and in fact, oh, prior to

8    June, counsel had made the comment to me that

9    we can't prove she worked there because we

10   don't have the payroll records.  So the agents

11   contacted the authorities in Mexico and they

12   went and looked.  There is no record there,

13   they're gone.  So this witness' testimony in

14   this trial that those are the documents that

15   were stolen from his administration holds true.

16             MR. JONES:  To clarify, what I told

17   you way before June is that there's no way that

18   they can prove that she worked for the Office

19   of Civil Registry because I have these

20   documents showing that she did not work at the

21   Office of Civil Registry, that she worked for

22   the Office of the Presidency.

23             MR. HOUGH:  Well, Judge, that's

24   something that he can argue to the jury, it's

25   something that the witness can testify to.  The

1    fact of the matter is that this witness was

2    cross-examined and not impeached.  And those

3    documents stand before this Court today

4    identified as documents stolen from his

5    administration in Mexico.  You have ruled that

6    you won't allow them in the court.  He cannot

7    properly lay the foundation for a stolen

8    foreign document.  And they're not admissible.

9              MR. JONES:  And not to belabor the

10   point, but the-- the Court said "I am not going

11   to allow these documents at this point."  And

12   I-- I mistakenly said, "Well, I'll put them in

13   through my client."  And he said, "Well, you--

14   you can-- you might offer them through your

15   client, but the Court will make the

16   determination."  And I-- and I-- I misspoke by

17   the way I said it, but I-- I thought and I

18   still think that-- that I should be able to

19   submit these documents through another witness.

20             THE COURT:  Is there any question

21   that she worked there?

22             MR. HOUGH:  No, Judge, it's not a

23   contested matter.

24             THE COURT:  I-- I think everybody has

25   admitted that she worked there and they told

1    her (sic) about when she came to work.  And so

2    why are we making a big point about this?

3              MR. JONES:  I don't know.  The

4    question was whether or not she worked for the

5    Office of Civil Registry or whether she worked

6    for the Office of the Presidency.  And-- and

7    this is probative value of-- of her contention

8    that she worked for the-- for the Office of the

9    Presidency and not-- and not the Office of the

10   Civil Registry.

11             MR. HOUGH:  Judge, the mayor

12   testified that she worked for him personally

13   and that he assigned her over to the Civil

14   Registry.  So it's not disputed that she worked

15   for the mayor anywhere in the case.

16             THE COURT:  Well, wasn't-- wasn't

17   there testimony as to what she did and what

18   she-- she had control over certain things and

19   she registered certain birth certificates and--

20             MR. HOUGH:  Yes.

21             MR. JONES:  That's what he said, but

22   she's going to testify differently, Your Honor.

23   She has testified differently.

24             MR. HOUGH:  Right before lunch she

25   said she never worked for the Civil Registry,

 1     which is at odds with what the mayor said.  The

 2     mayor said she was employed by him and that he

 3     had assigned her over to the Civil Registry and

 4     that by the end of the line she was essentially

 5     running the show there.

 6               MR. JONES:  And--

 7               MR. HOUGH:  But-- and who-- the

 8     payroll issue is not in dispute, that she was

 9     employed by the mayor is not in dispute.

10               MR. JONES:  Well, if these documents

11     are admitted into court, it's not like they're

12     going to go anywhere, they're going to be right

13     here with the Court as you requested from the

14     beginning.

15               THE COURT:  What is it you want to do

16     with these now, offer these into evidence?

17               MR. JONES:  I want to offer them into

18     evidence.  And the fact is that-- that

19     there's-- there's a big cloud hanging over

20     everything about whether or not she-- she stole

21     these documents from the-- from the Civil

22     Registry.  I mean, if-- if she is the type of

23     person that would steal from the Civil

24     Registry, she's the type of person who would

25     falsify her birth certificate or she would

 1          falsify all of these other things.  She-- I

 2          want to get that cloud of her having stole

 3          these documents out from over her head.

 4                    MR. HOUGH:  You can ask her, "Did you

 5          steal any documents?"  And she can say no.

 6                    MR. JONES:  And the-- the signatures

 7          on here that the mayor says, "I can't even read

 8          one of these signatures, the other two I think

 9          they are mine," that-- that goes at odds

10          exactly with-- with what you're saying about

11          these being original documents that were stolen

12          by-- by the-- the young horses and-- and given

13          to her surreptitiously.

14                    MR. HOUGH:  What I'm saying is that

15          was the mayor's testimony.

16                    MR. JONES:  I know, but I think we

17          can have testimony-- I think we're entitled to

18          have testimony that-- that goes opposite of

19          that.

20                    MR. HOUGH:  Yeah, you can ask her

21          that.  But the admissibility of stolen foreign

22          documents, they're not admissible.

23                    MR. JONES:  Well, the-- if they're

24          stolen, they probably wouldn't be admissible,

25          but I think that the-- the Defendant's

1  credibility is at least as good as that of the

2  mayor.

3  THE COURT:  Well, as of now, I'm not

4  going to allow you to admit these documents

5  because he said they were stolen.

6  MR. HOUGH:  That's correct.  Judge,

7  we didn't-- the court previously ordered that

8  the document--

9  THE COURT:  You can ask her about

10 them, sure, if she worked there and where she

11 worked.

12 MR. JONES:  Can I show them to her?

13 MR. HOUGH:  Judge, we'd object to

14 that.  They're not admissible.  Showing the

15 witness a document, having the witness describe

16 a document that's not in evidence is not

17 appropriate.

18 THE COURT:  You can show them to her.

19 You can show them to her.  I'm not going to

20 admit them.

21 MR. JONES:  Okay.  Fine.

22 (THEREUPON, the bench conference

23 was concluded and the following

24 proceedings were held within the hearing

25 of the jury)

1           THE COURT:  You may proceed.

2           MR. JONES:  Thank you, Your Honor.

3    Q.  (BY MR. JONES)  Ms. Guyton, I hand you what's

4        been marked for identification as Defendant's

5        Exhibits No. 4, 5 and 6.  Do you recognize

6        those documents?

7    A.  Yes.

8    Q.  When did you first see those documents?

9    A.  The first time I got paid at City Hall.

10   Q.  Explain to me what you mean by you saw-- you

11       saw those three documents or documents like

12       those when you first got there?

13   A.  I saw similar documents as these.

14   Q.  What-- what are documents like that for, how

15       are they used, how were they used in the

16       government?

17   A.  These documents are a list of persons in

18       alphabetical order which are paid, the persons,

19       department of the government.

20   Q.  Are you telling me that every department has

21       a-- a page like that with-- with the employees

22       listed thereon?

23   A.  Each list of persons of each department was

24       provided to the secretary of each department.

25   Q.  And how-- how many-- more or less are we

1    talking about those departments like the

2    treasury, the rural development, the

3    engineering office, each of those offices have

4    their separate payroll record?

5    A.  Yes, each department separately.

6    Q.  Okay.  And the-- from the time that you first

7    saw one of those for your department, who was

8    listed on the department where-- where your

9    name appears?

10   A.  The department that I was-- that I was working

11   with, it was only with the mayor and also with

12   the executive secretary.

13   Q.  And the-- the people at the Office of Civil

14   Registry, would they be in a separate payroll

15   record?

16   A.  Yes.

17   Q.  And No. 4, Defendant's 4, 5 and 6, for what

18   period are those payroll records?

19   A.  Evidence-- No. 4, it begins in May-- not

20   begins, but the date is May 31st, '91.  And No.

21   5, it goes from June 1st to-- '91.

22           THE DEFENDANT:  To the 15th.

23   A.  To the 15th.  And then No. 6 is June 16th to

24   the 30th of '91.

25   Q.  (BY MR. JONES)  So-- so that's three two-week

1        periods from May 15th through the end of June

2        of 1991; is that correct?

3    A.  May 16th all the way to June 30th.

4    Q.  Okay.  How did those three documents come into

5        your hands?

6    A.  I petitioned copies of these documents, a

7        recommendation of the director where I worked.

8    Q.  Where was that-- where was the office of the

9        director that you were talking about?

10   A.  Between the steps and the restroom.

11   Q.  Right-- right here?

12   A.  First floor.

13   Q.  And he-- he was for the protection of the

14       employees?

15   A.  Yes.

16   Q.  And tell us how that conversation came about.

17   A.  I went to talk to that Director of Employees.

18       I asked for counsel because I was at the point

19       of resigning to the-- of the City Hall.

20   Q.  And-- and what advice did he give you that

21       connected with those documents?

22              MR. HOUGH:  Objection, hearsay.

23              THE COURT:  Well, sustained.

24   Q.  (BY MR. JONES)  After getting advice from him,

25       why did you go get those three documents?

1     A.  This was requested to calculate vacation time

2         that was owed to me.

3     Q.  And who-- who requested that, you or-- or the

4         Director of Employees?

5     A.  I did it upon the advice of the Director of

6         Employees.

7     Q.  Where did you ask for it from?

8     A.  The city treasurer's department, City Hall.

9     Q.  Was there a process involved, did you have to

10        make a written application or did you just walk

11        in and they knew who you were and they gave it

12        to you?

13    A.  I did it in writing.

14    Q.  And how much time did it take to give it to

15        you?

16    A.  Enough time to take the book where they make

17        copies.

18    Q.  Did they make copies in that same building on

19        the first floor?

20    A.  Yes.

21    Q.  The same day?

22    A.  Yes.

23    Q.  And when you received those three documents,

24        what did you do with them in order to determine

25        your severance pay or vacation pay that you

1     were going to get?

2  A.  I gave it to the Director of Employees, he

3     calculated and he told me approximately how

4     much money I was going to get paid for vacation

5     time.  And he told me that if it was not the

6     approximate amount, that I should go back to

7     him.

8          MR. JONES:  Your Honor, for the

9     record, I would just offer those.  I understand

10    the Court's previous ruling, but I wanted to

11    make sure that I-- I made that offer.

12         MR. HOUGH:  Judge, the Court has

13    previously ruled that these stolen documents

14    are inadmissible, we would ask the Court to

15    maintain that ruling.

16         THE COURT:  I'm going to wait and

17    find out more about this before we-- before I

18    let these documents come in, because we have

19    this other testimony that's in here about those

20    documents.

21         MR. JONES:  I understand.

22  Q.  (BY MR. JONES)  Let me hand you what's been

23    marked for identification as-- as Defendant's

24    Exhibit No. 22.  Is there-- tell us-- can you

25    tell us what-- what's depicted in that picture?

1   A.   That's the interior part of the City Hall.

2                    MR. JONES:  Your Honor, I would offer

3        Exhibit No. 22, the interior picture of City

4        Hall.

5                    MR. HOUGH:  No objection.

6                    THE COURT:  That will be admitted.

7                    MR. JONES:  Permission to publish,

8        Your Honor.

9                    THE COURT:  Yes, you may.

10  Q.   (BY MR. JONES)  Ma'am, so this is the inside

11       of-- of those squares that you-- that you made

12       showing the upstairs of that-- of the second

13       floor?

14  A.   Yes.

15  Q.   And first of all, was-- was-- there's a--

16       there's a statue of an angel out in the atrium

17       area.  Was that there when you were there?

18  A.   No.

19  Q.   But do you recognize the interior-- or other

20       than that statue, do you recognize where this

21       is within that building?

22  A.   Yes.

23  Q.   Can you point to-- to what it is that you see

24       that-- that you can connect with-- with what

25       you've drawn up there as-- as a drawing on the

1   board?

2   A.   (Indicating).

3   Q.   You put four-- four arrows there, which one did

4        you mean?

5   A.   The last two is the entrance.

6   Q.   Oh, okay.  That's the entrance to-- to what?

7   A.   To the main waiting area.

8   Q.   And where-- where would your desk have been in

9        connection with-- with this photo?

10  A.   To the left.

11  Q.   So you--

12  A.   Down.

13  Q.   So you would walk in this door where the arrow

14       is and you would turn left?

15  A.   Effectively.

16  Q.   And if you wanted to see the-- somebody wanted

17       to see the mayor, they would enter that same

18       door?

19  A.   Yes.

20  Q.   And if somebody wanted to go to-- to the Office

21       of Civil Registry, would they enter that door?

22  A.   Yes.

23  Q.   And once they entered that door, where would

24       they go, which way would they go as they

25       entered that door for the Civil Registry?

1    A.   To the right.

2    Q.   I hand you what's been marked for

3         identification as Defendant's Exhibit No. 23.

4         Can you tell us what's depicted in that-- in

5         that picture?

6    A.   It's a-- a photo of the area where I was at.

7              THE DEFENDANT:  Where I work.

8              INTERPRETER BRACAMONTE:  Where I

9         work.

10   A.   With some of the co-workers, secretaries.

11             MR. JONES:  Move for admission of

12        Defendant's Exhibit 23.

13             MR. HOUGH:  No objection.

14             THE COURT:  23 will be admitted.

15             MR. JONES:  Permission to publish.

16             THE COURT:  Yes, you may.

17   Q.   (BY MR. JONES)  Who is this-- this lady?  Who

18        is this lady here on the left?

19   A.   That's the lady that did the cleaning, only in

20        the area where she's standing.

21   Q.   And this-- there appears to be a bar here.

22        What is this bar?

23   A.   That's my desk.

24   Q.   And who is this lady here?

25   A.   That's the Director of the Urban Development.

1          THE DEFENDANT:  Rural.

2          INTERPRETER BRACAMONTE:   Rural

3    development.

4    Q.  (BY MR. JONES)  This is a picture of you?

5    A.  Yes.

6    Q.  Who is this lady with the reddish or purplish

7        sweater?

8    A.  Angelita Munoz, one of the Civil Registry

9        secretaries.

10   Q.  Is she the one that Professor Benitez said that

11       basically you and-- you and her were the two

12       who-- who performed most of the-- of the

13       wedding ceremonies?

14   A.  Yes.

15   Q.  Okay.  The lady behind Angelita, who is she?

16   A.  She's one of the engineer department

17       secretaries.

18   Q.  This lady in the blue sweater?

19   A.  She's a secretary, department of livestock.

20   Q.  And finally this lady at-- on the right.

21   A.  That's the other Civil Registry secretary.

22   Q.  So they had two secretaries in that-- in the

23       Civil Registry?

24   A.  Yes.

25   Q.  And they had the official of the Civil

1      Registry, what was his name?

2   A.  The Professor Pedro Falcon Salinas.

3   Q.  When you were working for the Office of the

4      Presidency, at any time did you handle any of

5      the-- the books of the-- of birth records or

6      any of the books of marriage records?

7   A.  No.

8   Q.  Did you perform marriages on behalf of the

9      Office of Civil Registry?

10  A.  Yes, I did.

11  Q.  Explain the extent of your contact with the

12     Office of Civil Registry when you were assigned

13     marriages to perform.

14          INTERPRETER BRACAMONTE:  I'm sorry,

15     counsel, what department?

16          MR. JONES:  With the Office of Civil

17     Registry.

18  A.  Mrs. Angelita Munoz, she was in charge of all

19     of the necessary documents and prepared in a

20     folder.  And she would take it to my desk, she

21     would give it to me, she would tell me when and

22     where the marriage would take place.  And

23     this-- and at the same time she would give me

24     the money that was charged for marriage.

25  Q.  (BY MR. JONES)  By the way, did you operate

```
 1          under the-- under the theory of-- of, you know,

 2          the bigger the toad, the bigger the rock?

 3    A.    No.

 4    Q.    How-- how did-- how did you charge for the

 5          weddings?

 6    A.    I did not charge.  Angelita would be the one

 7          that would charge, Angelita Munoz.  She only

 8          gave me the amount of money.

 9    Q.    Was the amount of money the same every time?

10    A.    The marriages that I real--

11                THE DEFENDANT:  Performed.

12    A.    That I performed, yes.

13    Q.    (BY MR. JONES)  And would-- would you-- was

14          there a pattern that you and Angelita would go

15          to the marriages together?

16    A.    Yes.

17    Q.    And if-- if both of you were going to the

18          weddings, how would you-- who would do what at

19          each wedding?

20    A.    If I was going to be the one that performed the

21          marriage ceremony, I'm the one that would--

22          would receive the money.  And she would read

23          the information, the ones that were getting

24          married, and confirming that it was the correct

25          information.  And based on information, I would
```

1      perform the marriage ceremony.

2  Q.  And if Angelita-- if you were not getting the

3      money, what-- what would your role be?

4  A.  I would read in a audible voice the information

5      for the-- for the ones that were going to be

6      married and I would confirm that it was

7      correct.  And Mrs. Angelita Munoz will perform

8      the ceremony.

9  Q.  Were you guys marrying on average eight people

10     a week, eight couples a week?

11 A.  Not outside the building.

12 Q.  Okay.  And-- and if the marriage took place

13     inside the building, did-- did you charge?

14 A.  I-- I didn't charge.

15 Q.  And to your knowledge, did-- did-- were they

16     charged if the weddings were performed inside

17     the marriage-- inside the building?

18 A.  The same fee was inside the building and

19     outside the building.

20 Q.  I don't understand.  If-- if they charged the

21     same fee inside the building and outside the

22     building, why would you get money when you went

23     to someone's house but not get money when you

24     performed it inside the building?

25 A.  They would also pay inside, but I did not

1    receive it.

2    Q.  Did you perform marriages inside the building?

3    A.  No.

4    Q.  And Angelita, did she?

5    A.  Angelita always, and also the other secretary.

6    Q.  Okay.  The one who was on the right side of the

7        group photo?

8    A.  Yes.

9    Q.  After you worked for the administration for

10       about a year and nine months, why did you leave

11       the office of-- of the president?

12   A.  I decided to leave my position there, the

13       reason is because the relationship between me

14       and the mayor developed into a uncomfortable

15       relationship.

16   Q.  And how so?

17   A.  The City Hall mayor with a lot of frequency or

18       daily, after working for that day he would go

19       to places where he would be able to consume

20       alcohol.  And from there he would send buddies,

21       drinking buddies to go look for me to propose

22       to me.  They were not appropriate.

23   Q.  Did that happen on more than one occasion?

24   A.  Yes.

25   Q.  How many occasions?

1    A.   I don't know how many.  There were many, but

2         for him maybe it was just a few.

3    Q.   Did-- aside from-- from sending his-- his

4         friends to look for you, did he ever make any--

5         let me back up a second.  Did-- were there any

6         propositions like that during the day, during

7         the workday?

8    A.   Not during working hours.

9    Q.   Aside from sending people to make those

10       propositions to you, did he ever make one of

11       those propositions to you directly?

12    A.   Yes.

13    Q.   How many times?

14    A.   Several.

15    Q.   Tell us about-- about the times that he made

16       the-- made the proposition to you directly.

17    A.   I could tell you one that was done by telephone

18       and the other one direct contact.

19    Q.   Tell me about the-- the telephone one first and

20       then the direct contact.

21           MR. HOUGH:  Judge, we'll object to

22       this line of testimony.  The Defendant is

23       offering specific instances of allegations of

24       conduct by Professor Benitez of which he was

25       never asked about.  He's now back home in

1      Mexico, unable to defend himself against these

2      allegations.  So this is inadmissible.

3            MR. JONES:  Your Honor, I-- I'm

4      offering this-- this evidence to show the

5      reason that Ms. Guyton left that office, that--

6      the circumstances on which she left that office

7      and-- and perhaps the-- the motive for the--

8      for the mayor to be making the allegations that

9      he made as to her.

10            MR. HOUGH:  Judge, allegations of

11      specific instances of conduct or misconduct are

12      only admissible in certain specific parameters.

13      These are not those.  This is violative of the

14      rule and we would object and ask the jury to be

15      admonished to disregard this information.

16            MR. JONES:  I-- I will not-- I will

17      refrain from asking about the specific aspects

18      of-- of what went on between them over the

19      telephone and directly, but I-- I would ask the

20      Court not to-- not to cut off what we have

21      brought to this point, because I think that it

22      is admissible up to this point.

23            MR. HOUGH:  It's allegations of

24      specific instances of conduct or misconduct,

25      Judge.  It's inappropriate, it's inadmissible.

1          THE COURT:  Well, I will ask you to

2     refrain from any further questions in this

3     direction.

4          MR. JONES:  All right.

5  Q.  (BY MR. JONES)  Let me hand you what's been

6     marked for identification as Defendant's

7     Exhibit No. 24.  Can you tell us what

8     Defendant's Exhibit No. 24 is?

9  A.  That's my letter of resignation.

10  Q.  Is that a copy that you kept with you after you

11     delivered the letter of resignation?

12  A.  Yes.

13  Q.  And where did you keep that letter over the

14     years?

15  A.  In my house, a box of documents.

16  Q.  Would it be the same box where the payroll

17     records were?

18  A.  Yes.

19  Q.  And I'm going to hand you what's been marked

20     for identification as Defendant's Exhibit

21     No. 25.  What is that document?

22  A.  It's a proof of work.

23  Q.  And-- and for what purpose would a-- a-- an

24     employee of the municipality receive a letter

25     such as that?

1    A.   This is a type of a recommendation for an

2         employee.  This letter was also taken place in

3         the same time with the payroll charts.

4    Q.   And did you ever utilize that-- that letter of

5         recommendation?

6    A.   I did take it to the Director of Employees.

7    Q.   Did you use it in seeking other employment

8         after leaving the Office of the Presidency?

9    A.   Yes.

10   Q.   And where have you-- who signed the

11       recommendation letter for you?

12            (THEREUPON, the Defendant begins

13       answering in Spanish).

14            INTERPRETER BRACAMONTE:  I'm going to

15       request the witness to go with one sentence at

16       a time, please.

17   A.   This is the Professor Jose Jesus

18       Rodriguez-Benitez, but the one that's signed

19       there is Armondo Gonzales, which was the chief

20       of counsel.  And then the secretary of counsel

21       was Professor Pedro Falcon Salinas.

22   Q.   (BY MR. JONES)  And where-- where did you--

23       where have you stored or kept that record over

24       the years?

25   A.   Same place, where the payroll list.

1    Q.  In the same place that the letter of

2        resignation was kept?

3    A.  Yes.

4             MR. JONES:  I would like to offer

5        Defendant's 24 and 25, Your Honor.

6             MR. HOUGH:  May we approach, Judge?

7             THE COURT:  Yes, you may.

8             (THEREUPON the following

9             proceedings were held at the bench and

10            outside of the hearing of the jury).

11            MR. HOUGH:  Judge, if you look at the

12       first Exhibit 24, those are original

13       signatures.  That's an original document, which

14       would be indicative of theft from the

15       government of Mexico.  Exhibit 25 is also an

16       original signature of someone on top of

17       something that's been Liquid Papered out,

18       Professor Pedro Falcon Salinas.  These are

19       again original signatures, Judge.

20            The Defendant is again presenting this

21       court with documents of an original nature that

22       appear to have been, like the payroll records,

23       stolen from the government of Mexico, which is

24       the only explanation for, one, them not being

25       shown to ex-mayor Benitez when he was here or

1    he would have so identified them.  You've got

2    Liquid Paper through 25.  It's highly

3    irregular, it's highly unusual to present these

4    original signature documents here.

5         The only way that the original signature

6    documents could be presented in this matter is

7    if they are, in fact, stolen from the

8    original-- be stolen originals from the mayor's

9    office at Ojinaga, Chihuahua, Mexico.  And we

10   would ask the Court to issue the same ruling it

11   did on the other stolen documents.

12             MR. JONES:  Your Honor--

13             MR. HOUGH:  Look at the signatures,

14   those are originals.

15             MR. JONES:  Your Honor, I submit

16   that-- that Mr. Hough is-- everything he said

17   is speculation.  He-- the witness has testified

18   as to how she got the documents.  Mr. Hough can

19   cross-examine her on them and if-- and if-- if

20   she-- if he can damage her credibility over

21   those documents, then so be it.  But she has

22   testified forthrightly as to how she got those

23   documents and I-- I see no reason why the-- why

24   her credibility should be put to any-- any

25   greater test than-- than that of-- of the

1       professor.

2               MR. HOUGH:  Judge, if you look at the

3       documents, even a layperson, even someone, a

4       child, can see that those are original

5       signatures.  And the only way--

6               MR. JONES:  I'm not saying they're

7       not original--

8               MR. HOUGH:  -- that those original

9       signatures-- those documents, if, in fact, they

10      are what they represent to be and given the

11      seal-- if you look at the seal, Judge, it's

12      identical, identical to the seal that's on the

13      other documents the professor identified as

14      stolen.  Look at the signatures.  In fact,

15      specifically look at the signature on top of

16      the Liquid Paper.  That is obviously an

17      original signature.

18              MR. JONES:  Correct.

19              MR. HOUGH:  Absolutely these are

20      original signatures.  Original signatures means

21      that they came out-- those are the originals

22      taken from the mayor's records in Ojinaga,

23      Mexico, Judge.  She had to have stolen those at

24      the same time when she took 4, 5 and 6.

25              MR. JONES:  If your secretary leaves

1     your office and asks you for a letter of

2     recommendation, are you going to send her out

3     with-- with a copy of-- of the recommendation

4     or are you going to send her out with just

5     signatures, original signature on it?

6          MR. HOUGH:  This is a blank form.

7     This is a blank form that has-- it's a

8     fill-in-the-blank form, Richard.

9          MR. JONES:  But once you send her

10    out, are you going to send her out with an

11    original signature or are you going to send her

12    out with a copy of your signature?

13         MR. HOUGH:  Are you going to send her

14    out with one that's got Liquid Paper on there

15    so you doubt the authenticity of it?

16         MR. JONES:  If I'm in Mexico, I

17    might.

18         MR. HOUGH:  If wishes and buts were

19    candy and nuts, we'd all have a Merry

20    Christmas.  They're stolen documents, Judge.

21    They're original signatures.  And we don't

22    believe that the Court should allow them to be

23    admissible.  The authenticity of the stolen

24    document, the foundation of an official foreign

25    document is controlled by, what is it, Rule 903

```
 1        and insufficient foundation has been--

 2                    MR. JONES:  It's not an official

 3        document.

 4                    MR. HOUGH:  -- established.

 5                    MR. JONES:  It's her files.

 6                    THE COURT:  Why don't we take a break

 7        at this time and we'll discuss this a little

 8        bit more.

 9                    MR. HOUGH:  Thank you.

10                     (THEREUPON, the following

11                  proceedings were held at the bench and

12                  outside of the hearing of the jury).

13                    THE COURT:  Ladies and gentlemen,

14        let's take about a 15-minute break at this time

15        and we'll discuss a few other matters here.

16        Mr. Bailiff, would you recess the Court.

17                     (THEREUPON, a recess was had).

18                    THE COURT:  All right.  We're all

19        present.  I'm going to make some rulings here

20        before we proceed any further.  We've studied

21        further the documents that have been offered.

22        And I am now going to admit Document 24,

23        Document 25, and I'm going to admit the other

24        documents that were refused earlier, but I'm

25        going to admit Documents 4, 5 and 6.  And those
```

1       will be admitted and they can-- attention can

2       be turned to those documents on

3       cross-examination.

4            All right.  I believe we're now ready to

5       proceed, Mr. Jones.

6                 MR. JONES:  Thank you, Your Honor.

7    Q.  (BY MR. JONES)  When you left the-- the Office

8       of the Presidency, where did you-- where did

9       you go to live or did you move from Ojinaga?

10   A.  Before I resigned my position, I was going out

11      with Miguel Giner, we were boyfriend and

12      girlfriend.  He offered to help me find a job

13      in the city of Chihuahua.  I went to live over

14      there.

15   Q.  And did you secure a job in Chihuahua?

16   A.  I found employment.

17   Q.  And in what-- what did you do there?

18   A.  I was a helper in an office of attorneys.

19   Q.  And how long did you work there?

20   A.  Only for a few days, it was less than one week.

21   Q.  And why-- why did you leave the job so quickly?

22   A.  Miguel Giner proposed to me.  He told me that

23      there was no need for me to work, I want to

24      marry you and I will support your children.

25   Q.  How-- how long did you live together as a--

1      wait a minute.  When did you get married?

2   A.  August 17th, 1991.

3   Q.  That is approximately 32 days from the time

4       that you left your position with the

5       presidencia of-- the Office of the President in

6       Ojinaga.  Correct?

7   A.  Yes, it was.

8   Q.  And so when you-- when you married-- did you

9       invite the professor, Professor Benitez to the

10      wedding?

11  A.  Everyone at the City Hall were invited.

12  Q.  And who performed your wedding?

13  A.  The officer at the Civil Registry, it was

14      Falcon Salinas, he was there present.  The

15      place, it was not well-lighted.  The daughter

16      of the Professor Salinas, which she is a

17      teacher and she did not work in the City Hall

18      and also she did not work at the Civil

19      Registry, she's the one that performed the

20      ceremony.

21  Q.  You guys got married in August of 1991.  And

22      I-- there's been some testimony as to-- as to

23      when you moved from Chihuahua to come to-- to

24      Kansas.  Tell us why you did not continue

25      living in Cuidad, Chihuahua.

1    A.  My husband was working for the state of

2        Chihuahua under the protection of the--

3              INTERPRETER BRACAMONTE:  I believe in

4        short it's PRI.

5              MR. JONES:  PRI.

6    Q.  (BY MR. JONES)  Continue.

7    A.  Elections came very close and there was

8        speculation that the Pri Party was not going to

9        win.  The speculation was that my husband was

10       going to lose his job, so he began to plan our

11       future and part of our future planning was the

12       possibility to migrate to the United States.

13    Q.  Were you-- were you in accord with that plan?

14    A.  That's the plan that my husband offered to my

15       family.

16    Q.  And when he offered that-- that proposition,

17       what was your reaction?

18    A.  Insecurity.

19    Q.  Why?

20    A.  I think there's always a sense of insecureness

21       when you're going to an unknown place.

22    Q.  And where were your-- where were the rest of

23       your family living at that time?

24    A.  Mexico on the side of my mother, and in the

25       United States on the side of my father.

1    Q.  With respect to the-- the part of your family

2        that you grew up with after your father died,

3        where were they living in Mexico?

4    A.  My mother and younger two brothers in Ojinaga.

5        And my older brother with me in Chihuahua.  He

6        was working at el sieta at that time.

7                MR. JONES:  In the mountains.

8                THE DEFENDANT:  The mountains.

9                INTERPRETER BRACAMONTE:  In the

10       mountains.

11    Q.  (BY MR. JONES)  What was he-- what was he doing

12        in the sieta, in the mountains?

13    A.  He was working for an engineer.

14    Q.  Did you discuss with him the-- Miguel's plan

15        for-- for the move?

16    A.  Yes.

17    Q.  And with your mother?

18    A.  Yes.

19    Q.  Did you-- did there-- did the rest of the

20        family, apart from Miguel, come to some-- any

21        kind of conclusion about Miguel's plan?

22                MR. HOUGH:  Judge, we'll object.

23        This is hearsay and it's also irrelevant.

24                THE COURT:  Well, I think that's

25        correct.  I'll sustain the objection.

```
 1    Q.  (BY MR. JONES)  Did there-- did you ultimately
 2        come to a decision about moving to the United
 3        States?
 4    A.  Yes.
 5    Q.  And this-- the decision was obviously that you
 6        would come here?
 7             INTERPRETER BRACAMONTE:  I'm sorry,
 8        counsel?
 9    Q.  (BY MR. JONES)  The decision was that you
10        would-- that the family would move to the
11        United States?
12    A.  Yes.
13    Q.  And what was necessary for you to do in order
14        to make that move?
15    A.  To be able to obtain the legal way to come.
16    Q.  And what did that entail?
17    A.  Obtain a citizen passport.
18    Q.  And where-- where did you have to go to apply
19        for the passport?
20    A.  The city of Chihuahua in Chihuahua at the
21        American consulate.
22    Q.  And you could do the-- all the applications
23        right there in Chihuahua?
24    A.  Yes.
25    Q.  Did you go alone or with someone?
```

1   A.   With my two younger brothers.

2   Q.   And did you have to take any documents with

3        you?

4   A.   Yes.

5   Q.   What did you take?

6   A.   A package that my mother had-- that had

7        prepared for me.

8   Q.   When you went to the-- to the consulate, did

9        they give you an application?

10  A.   We already had the application.  That process

11       initiated already for several years.

12  Q.   So when you went to the-- to the consulate with

13       your younger-- with your two younger brothers,

14       did you already have the application filled

15       out?

16  A.   Yes.

17  Q.   When you filled out the application, did you

18       have to refer to any documents in order to-- to

19       fill out the application?

20  A.   No.

21  Q.   Let me direct you specifically to Question No.

22       14 on-- on the U.S. passport application.  It

23       asks what your father's name was.  What did you

24       put down on that line?

25  A.   Samuel Ross Guyton.

1    Q.   And then they ask what was-- what was his place

2          of birth.  What did you put on that line?

3    A.   Walnut Springs, Texas.

4    Q.   When they asked what was his date of birth,

5          what did you put on that line?

6    A.   October 30th, 1931.

7    Q.   And-- and when it asked whether or not he was a

8          citizen of the United States, what was your--

9          what was your answer?

10   A.   That he was.

11   Q.   Those were your answers back on April 19th or

12         20th of 1992?

13   A.   Those have always been my answers.

14   Q.   Did the officer at the passport application

15         place request to see any documents?

16   A.   Yes.

17   Q.   They asked for-- for documents from you or from

18         your brothers or from both or from all three?

19   A.   Of all.

20   Q.   And tell me what you remember about-- do you

21         remember paying a premium of $10 per

22         application?

23   A.   Yes.

24   Q.   Tell me-- tell me what you recall about why you

25         paid that $10 premium on each of those

1 applications.

2 A. After the consulate accepted of all of us, she

3 told us that-- that it was going to-- that it

4 was going to take place, the citizenship for

5 the younger brothers. And passport of

6 citizenship for all four.

7 Q. But she said-- she said that all four were

8 approved for passports?

9 A. Yes.

10 Q. And the two minor children were approved for

11 citizenship certificates?

12 A. Yes.

13 Q. But what did she say about paying a-- a premium

14 of $10?

15 A. She informed that those documents were not

16 going to be ready on the same date unless a

17 extraordinary premium would be paid. And if

18 it's-- if it's not that way, so she suggested

19 that it was not done that way, then you have to

20 send it through mail, post office, but she said

21 that the Mexican post office is not too

22 trustworthy. Or to come back on the following

23 day or the other day to pick them up, which it

24 wasn't too available for us.

25 Q. And so-- so it was the bottom line that if you

1    paid $10 you could get it the same day?

2  A.  Yes.

3  Q.  After getting your passport, did you find out

4      or did anybody tell you about needing to get a

5      Social Security card?

6  A.  The consulate told us that once we received

7      passport, that we ought to go to the closest

8      administration of Social Security, which was

9      Presidio, Texas.

10 Q.  And-- and did you make arrangements to go to

11     Presidio to apply for a Social Security card?

12 A.  Yes, we did.

13 Q.  And tell me about that experience.

14 A.  The consulate told me that we needed to take

15     the passports and some documents of income tax

16     of my father.  That's what we took and we took

17     it to the office, but I meant to say that

18     there's no office in Presidio, Texas, but

19     that's what we took to the place.  So an agent

20     once a month would go to Presidio, Texas, and

21     people would make appointments to see him that

22     day.

23 Q.  And when your turn came to-- to see this Social

24     Security official, what happened?

25 A.  He had some forms to-- to apply for the Social

1        Security number.  And he was showing me what to

2        fill in in each part of the form.  And then I

3        showed him the other income tax documents after

4        the form was filled, and he told me that Social

5        Security numbers were secured for my brothers

6        and I.

7  Q.  So at that point he saw some of your-- your

8        father's income tax returns that had you and

9        your brother's Social Security numbers on them?

10           MR. HOUGH:  Well, Judge, I'll object.

11        That assumes facts not in evidence and it's

12        leading.

13           THE COURT:  Let's see if we can clear

14        it up.

15  Q.  (BY MR. JONES)  You had the form-- you had the

16        Social Security form filled out; is that

17        correct?

18  A.  Yes.

19  Q.  And what happened after you had the form filled

20        out between you-- or what conversation went on

21        between you and the Social Security official?

22  A.  I told him that the consulate in Juarez--

23  Q.  Wait a minute.  Did you go to the consulate in

24        Juarez or the consulate in Chihuahua?

25  A.  The city of Juarez, Chihuahua.

1   Q.  So everything that you talked about with the

2       consulate, that happened in-- in Cuidad,

3       Juarez?

4   A.  Yes.

5   Q.  Okay.  Okay.  And before I interrupted you, you

6       said that you told the-- the official in

7       Presidio what the consulate told you.

8       Continue, please.

9   A.  I told him that the consulate told me that I

10      needed to show those documents to the-- to the

11      official agent.

12  Q.  Did the agent for Social Security then review

13      those documents?

14  A.  Yes.  He reviewed them and he said that it was

15      okay and that those Social Security numbers

16      were secured for my family and I.

17  Q.  They had already been assigned for you and your

18      brothers?

19  A.  That's my understanding.

20  Q.  Let's-- let's take a different tact for a

21      moment.  Let's talk about those altered

22      documents.  And when I say altered documents,

23      I'm talking about the birth certificate of

24      yours that had a registration date of August,

25      1965 and a marriage certificate that had an

1       altered date of marriage that went from 1969

2       over to 19-- from 1969 over to 1965.  Do you

3       know what I'm talking about?

4    A.  Yes.

5    Q.  Did you alter those documents?

6    A.  Yes.

7    Q.  Tell the jury when you altered them.

8    A.  I was in the first year of high school.

9    Q.  And tell the jury why you altered those

10      documents.

11   A.  Since the death of my father, my mother went

12      into a stage of depression to the point that

13      things on the family could not be understood.

14      She would continuously repeat the

15      certificates-- that they were mistakenly and

16      that they should be corrected.  She would say

17      we just need to make the corrections.  So she

18      informed me what the corrections should be and

19      she continued insisting that it should be done.

20   Q.  And then you-- you made the corrections?

21   A.  One day as I was going to school I was walking

22      from-- from the house to the school.  Walking

23      was more or less five miles.  I would-- I would

24      always walk with my friend of school-- from

25      school.  So one day we arrived at the City Hall

1          so we asked for the-- those certificates.

2                    INTERPRETER BRACAMONTE:  If I may,

3          counsel, expecion (phonetic), is that like

4          atonement of the--

5                    MR. JONES:  Issuance.

6                    INTERPRETER BRACAMONTE:  The what?

7                    MR. JONES:  Issuance.

8     A.   The issuance of the certificates.  And--

9                    INTERPRETER BRACAMONTE:  I need to

10         ask the witness to repeat what she said.

11    A.   And the secretary was making other--

12                   THE DEFENDANT:  Typing.

13    A.   -- copies.  She was typing.  So she told me

14         that I needed to go to collection where you can

15         get blank forms.

16    Q.   (BY MR. JONES)  I think when the-- for

17         clarification purposes, when the professor was

18         here and he called it precaudaura de rentas,

19         we agreed that that was the revenue office.

20    A.   Yes.  So when I returned with the blanks, I

21         gave it to the secretary, she had the book

22         corresponding to the date of birth and

23         approximately the date of marriage.  So she

24         began to give me the books one at a time.  So

25         she gave me instructions to go sit at-- at the

1     other side of the waiting room so I could find

2     my certificate.  And when I would find it, to

3     take it to her.

4  Q. And when she instructed you to go sit on the

5     other side of the room, what did you do?

6  A. At that moment my friend and I, we did the

7     correction that needed to be done according to

8     my mother.

9  Q. And did you return that book to the secretary

10    in-- in Civil Registry?

11 A. Yes, and there she gave issuance.

12 Q. She issued?

13 A. She issued the certificates.  At which I'm

14    supposed to pick them up two days later.

15 Q. Did you do the same thing with the certificate

16    of marriage of your parents?

17 A. Yes.

18 Q. And did you, in fact, pick them up within a

19    couple of days?

20 A. Yes.

21 Q. When you went to the office, the revenue office

22    to get those blank forms, did they charge for

23    them?

24 A. Yes.

25 Q. So you paid for the forms, then take them back

1        to the Civil Registry?

2     A.   Yes.

3     Q.   Mr. Treviso, who is now the official of the

4          Civil Registry in-- in Ojinaga, either he or

5          maybe he and Mr. Camacho said that in order to

6          get a-- a birth certificate or a marriage

7          certificate now, the interested party has to

8          appear with identification.  Did you hear that

9          testimony?

10    A.   I did hear.

11    Q.   When is the last time you've been to Mexico?

12    A.   1994 in March--

13                 THE DEFENDANT:  No.  (Speaks

14         Spanish).

15    A.   March, 2004.

16    Q.   (BY MR. JONES)  After this case was-- was filed

17         against you, you have received two sets of

18         birth certificates for yourself and-- and

19         marriage certificates for your parents; is that

20         correct?

21    A.   Yes.

22    Q.   And throughout this time, you've been under--

23         under an order from another judge not to leave

24         the country.  Correct?

25    A.   Yes.

1  Q.  Okay.  How-- tell-- tell the jury how you got

2      those-- those two sets of-- of certificates.

3              MR. HOUGH:  Your Honor, I would ask

4      for clarification as to which certificates,

5      birth certificates or marriage certificates.

6              MR. JONES:  Both.

7  A.  The first one I called Professor Falcon

8      Salinas, which he is a personal friend.  I

9      asked him if he could provide some copies for

10     me.

11             THE DEFENDANT:  Obtain.

12             INTERPRETER BRACAMONTE:  The witness

13     says obtain.

14 A.  And he obtained them and he sent them by mail.

15     Marie Elena Armendariz, she is also a personal

16     friend--

17 Q.  (BY MR. JONES)  Is this the same Marie Elena,

18     who was the Director of Rural Development?

19 A.  Yes.

20 Q.  And how did she get your birth certificate and

21     your parents' marriage certificate?

22 A.  She just went and petitioned.

23 Q.  And those that Marie Elena asked for are the

24     ones that wound up with the apostille

25     certification?

1   A.  Yes.

2   Q.  When you were in the Office of Civil Registry

3       with your-- with your friend and you guys made

4       those alterations, did-- did you ask for

5       permission to-- to make those corrections?

6   A.  No, no one said that I could not do it.

7   Q.  Did you-- did you hide to do it?

8   A.  There was no place to hide.

9   Q.  Was-- did anybody stand over your shoulder

10      while you did it?

11  A.  The secretaries were across the room as they

12      were typing.

13  Q.  Did you think you were doing anything wrong?

14  A.  No.

15  Q.  The birth certificates or the birth record that

16      you had there, let's just talk about birth

17      records right now.  Do you understand me?

18  A.  Yes.

19  Q.  It-- it said that the-- that the child's name

20      was-- was Diana Velia Guyton-Chavira.  Correct?

21  A.  Yes.

22  Q.  It said that-- that the child was born on June

23      the 14th, 1965; is that correct?

24  A.  Effectively.

25  Q.  It said that-- that the mother of the child was

1       Alicia Chavira.  Correct?

2   A.  Correct.

3   Q.  Said that the father of the-- of the child was

4       Samuel Ross Guyton?

5   A.  Yes.

6   Q.  It had a date on it for the date of

7       registration being in 1972; is that correct?

8   A.  Yes.

9   Q.  And the correction or the-- the alteration,

10      call it what it is, the alteration that you

11      made changed the-- the 1972 to 1965.  Correct?

12  A.  Yes.

13  Q.  And you changed the age of your mother and the

14      age of your father to make it correspond to

15      what they would have been seven years earlier;

16      is that correct?

17  A.  That's the age that my mother told me that they

18      had, yes.

19  Q.  Did you change anything about who the mother

20      was?

21  A.  No.

22  Q.  Did you change anything about who the father

23      was?

24  A.  No.

25  Q.  And on the marriage certificate, you changed

1      the-- of the date of the marriage from June--

2      or from July of 1969 to July-- or to May

3      of 1965; is that correct?

4  A.  Yes.

5  Q.  And you also changed the-- the ages in

6      accordance with what your mother told you?

7  A.  Yes.

8  Q.  When you-- when you completed those

9      alterations, did you tell-- did you tell your

10     mother what you had done?

11  A.  Yes.

12  Q.  And how did she react?

13  A.  The only thing what she said--

14          MR. HOUGH: Object to what she said

15     as hearsay, Judge.

16          MR. JONES: I-- I'm not offering this

17     to prove the truth of-- of what it asserts, I'm

18     just offering it to prove the-- the reaction

19     that her mother had.

20          MR. HOUGH: He didn't ask the

21     reaction, he asked her what she said. And

22     through the interpreter the witness answered

23     "she said" prior to my objection.

24          THE COURT: Well, I believe I'm going

25     to let it in. Go ahead and give the answer.

1    Q.  (BY MR. JONES)  Give me your answer-- or give--

2         give me her reaction again.

3    A.  She said, "What a relief that there's a-- a

4         less burden upon us."

5    Q.  Do you know-- did you know what she meant when

6         she said that?

7                MR. HOUGH:  Objection, speculation.

8                THE COURT:  I'll sustain that.

9    Q.  (BY MR. JONES)  After you lived in the United

10        States for a period of time, did you, Miguel

11        and the children go back to Mexico to go

12        through a legal proceeding?

13    A.  Legally, yes.

14    Q.  And tell us what that legal proceeding was.

15    A.  Through Miguel, the recognition of my children.

16    Q.  And-- and what-- what steps did you have to

17        take in order to have that recognition

18        accomplished?

19    A.  Only to present ourselves before the Civil

20        Registry and to inform him that we want to make

21        recognition of the children.

22    Q.  And what-- what was the-- after-- after you

23        completed that process, did you wind up making

24        a new application for-- for a Social Security

25        card?

1    A.    Yes.

2    Q.    And why was that?

3    A.    Well, since my children had my husband's name

4          and also the child that was--

5                THE DEFENDANT:  That I was pregnant

6          with.

7    A.    Which I was pregnant also had the name.  My

8          husband suggested that we ought to use the

9          American style that the wife should only have

10         the husband's last name and not the father,

11         which is done in Mexico.  So I changed my last

12         name from Guyton to Giner, which is the last

13         name of my ex-husband.

14   Q.    (BY MR. JONES)  Okay.  Initially you had gotten

15         a Social Security card with that part-time

16         agent in Presidio.  Correct?

17   A.    Yes.

18   Q.    And then in 1994, just before you gave birth,

19         you got-- you changed your name to Giner and

20         got a new Social Security card.  Correct?

21   A.    That's correct.

22   Q.    And between the Presidio Social Security card

23         and the 1994 Giner Social Security card, you

24         applied for a-- another Social Security card,

25         didn't you?

1    A.   Yes.

2    Q.   Why did you solicit a-- the second Social

3         Security card right after you had gotten one in

4         Presidio?

5    A.   At that time I was working at Ellinwood,

6         Kansas.

7              THE DEFENDANT:  Uh-huh.  Ellinwood,

8         Kansas.

9    A.   Assisting an elderly.  I would finish working

10        at 9:00 at night.  To get back to Great Bend I

11        would need to drive 15 minutes.  One night when

12        I arrived at home I took to her house--

13             THE DEFENDANT:  The babysitter.

14             INTERPRETER BRACAMONTE:  The

15        babysitter.

16   A.   Returning to my house, I stopped at the gas

17        station to get gas.  But then my daughter

18        Himena (phonetic) was asleep.

19             THE DEFENDANT:  Kimberly, my twin

20        daughter.

21             INTERPRETER BRACAMONTE:  Which is a

22        twin daughter.

23   A.   In the back seat of the car.  And my son, which

24        is a twin, was in-- in the front seat with me.

25        My bag was-- purse was in the front seat.  So

1        as I was ready to go pay for the gasoline, I

2        only got exactly the amount.

3              MR. HOUGH:  Judge, we'll object, this

4        is irrelevant.

5    A.  At that moment--

6              THE COURT:  Well, now that we're into

7        it, overruled.  You may go ahead.

8    A.  And at that time that's when a Jeep pulled also

9        to get gasoline.  There were four teenagers in

10       the Jeep.  I took my son's hand, we went inside

11       the store to pay for the gasoline and there

12       were three people ahead of us.  As I finished

13       paying and went back to the car, I noticed that

14       my bag was open and my purse with my

15       identification and the rest of the money had

16       disappeared.  And also my Social Security card

17       was in there.

18   Q.  (BY MR. JONES)  And did you apply for a fourth

19       Social Security card in 2002-- 2001?

20   A.  Yes.

21   Q.  And where was it-- why-- and briefly tell us

22       why you applied for the fourth Social Security

23       card.

24   A.  When Judge Anderson authorized for me to go

25       back to my maiden name when-- as a single, I

1    needed a new Social Security card as a single

2    person so I could present to my employer for

3    the sake of income tax.

4  Q.  Have you-- you have seen the-- the Social

5    Security card application that you made when

6    you first learned how to write with the letters

7    that-- attached to each other in cursive?

8  A.  Yes.

9  Q.  And in that application, it asks for your place

10   of birth and it says Ojinaga.

11 A.  Yes.

12 Q.  Who filled out Ojinaga in that-- in that

13   application?

14 A.  It could have been Father.

15 Q.  And in each of the-- of the-- each of the four

16   applications for Social Security that you have

17   made starting with Presidio, Ellinwood,

18   changing to Giner and changing back to Guyton,

19   what city of birth have you placed in those

20   applications?

21         INTERPRETER BRACAMONTE:  Did you say

22   place of birth, counsel?

23         MR. JONES:  Yes.

24 A.  The only place that I have knowledge of being

25   born is Ojinaga.

1    Q.   (BY MR. JONES)  As-- as of the time that you

2         got divorced and was-- were soliciting a

3         replacement Social Security card with the--

4         with your maiden name, did you know anything

5         about a controversy as to whether you were born

6         in Camargo or in Ojinaga?

7    A.   No.

8    Q.   When did you-- when is the first time that you

9         ever heard that there-- that there was a

10        possibility that you were born in Camargo?

11   A.   Last year when all of this began and my

12        attorney gave me a certificate.

13   Q.   And what was your-- what do you remember upon--

14        what do you remember thinking upon seeing that

15        birth certificate from Camargo?

16             MR. HOUGH:  Objection, irrelevant.

17             THE COURT:  Well, overruled.  Go

18        ahead.

19             INTERPRETER BRACAMONTE:  Did you want

20        her to--

21   Q.   (BY MR. JONES)  Yeah, what was-- what was your

22        reaction upon seeing the birth certificate from

23        Camargo?

24   A.   Surprised.

25   Q.   And in-- was there-- was there anything apart

1        from the fact that there was a Camargo birth

2        certificate that gave you the surprise?

3  A.   Yes.  The fact that I have knowledge that I am

4        the oldest, that I am the oldest daughter and

5        that certificate says that I am the second

6        daughter of my mother.

7  Q.   Let's talk about March the-- March of 2004.  Do

8        you recall that month?

9  A.   Yes.

10  Q.   What-- what is significant about the month of

11        March of 2004?

12  A.   I was interrogated--

13              INTERPRETER BRACAMONTE:  I didn't

14        quite got the last word on that witness if I

15        may.

16  A.   At the--

17              THE DEFENDANT:  Checkpoint.

18  A.   -- point of entry I was interrogated.

19  Q.   (BY MR. JONES)  Well, let's back up before

20        that.  Why were you-- why-- why were you south

21        of Kansas in March of 2004?

22  A.   The week of spring my ex-husband, he gets to

23        have my daughter all that week.

24  Q.   Are we talking about school vacation for the

25        children?

1    A.   Yes.

2    Q.   Continue, please.

3    A.   That week he had my daughter and I asked

4         vacation time one week for that week so I could

5         take my children to Mexico to visit family.

6         And then I found out that my ex-husband was

7         going to take my daughter that same week to

8         Mexico.

9    Q.   (BY MR. JONES)  Okay.  And so you took your

10        three oldest children to Mexico for spring

11        break?

12   A.   Plus my son's girlfriend, which she is now his

13        wife.

14   Q.   And where in Mexico did you go?

15   A.   Camargo, Chihuahua.

16   Q.   And what happened-- what day did you arrive?

17   A.   Sunday, I don't quite remember the date.

18   Q.   But the-- would it be the Sunday before March

19        the 26th when you were arrested?

20   A.   Yes.

21   Q.   And you were arrested on a Friday?

22   A.   Yes.

23   Q.   You arrived on Sunday.  Did anything unusual

24        happen on Sunday?

25   A.   Miguel Giner called me to ask me if I wanted to

1     go out.

2  Q.  Well, anything else rare?

3  A.  Sunday, no.

4  Q.  Anything out of the ordinary happen the next

5     day?

6  A.  Yes.

7  Q.  Tell us what happened.

8  A.  Monday, 9 o'clock in the morning, three police

9     from the area from-- from the state, they went

10    to my grandmother's house and they told me that

11    I needed to go with them so they could give me

12    some documents.

13 Q.  Did you go?

14 A.  I told them that I would go later.  And that's

15    what happened.

16 Q.  Okay.  Did you-- did you go to the office to

17    get the papers?

18 A.  Yes.

19 Q.  Same day?

20 A.  Yes.

21 Q.  Alone or accompanied?

22 A.  A Mexican attorney accompanied.

23 Q.  And did you give a statement that day?

24 A.  No, because my attorney informed them that he

25    was going to give an answer of those documents

1          at a later date at my convenience.

2     Q.   Did you have any more contact with the Mexican

3          authorities between Monday and the time that

4          your vacation ended?

5     A.   No.

6     Q.   And-- and your-- at the end of-- of the week,

7          tell us what happened on your-- as you crossed

8          the border.

9     A.   We decided to go back on Friday.  And at the

10         point of entry where they check in Presidio,

11         Texas, they asked for papers, passport, where

12         are you going.  Now, which is my son's wife and

13         I, we said U.S. citizens.  So they asked me for

14         identification.  I showed them my driver's

15         license.  Now, my daughter-in-law and my son,

16         they did the same.  And the twins, they showed

17         certificate of citizenship.

18    Q.   Okay.  And when-- when all of this

19         identification happened, what-- what did the--

20         did the officials let you go or did they take

21         you somewhere or what happened?

22    A.   They said that they needed to check the

23         vehicle, so they took us to the interior of the

24         building.

25    Q.   And when you were in the-- inside of the

1     building, what was the next thing that happened

2     with you?

3  A. After waiting for several hours, they led me to

4     an office where they made me wait for some

5     time.  And then another agent came which took

6     me to another office, another annex.  He asked

7     questions and then he asked me to write down

8     the different addresses that I had lived in

9     United States.  He also asked me the places

10    where I have worked in this country.

11 Q. Okay.  Is that-- is that-- was that person who

12    asked you to do that, was that Mr. Upton or was

13    that the person who accompanied Mr. Upton?

14 A. It was another agent that's stationary in that

15    building.

16 Q. Okay.  And so you-- so you wrote-- you wrote

17    out all the places you had lived and all the

18    places that you had worked?

19 A. Yes.

20 Q. And do you-- you were telling us about where

21    you had been moved from here to there and what

22    you've been asked to do.  Had Mr. Upton arrived

23    yet?

24 A. No, not yet.

25 Q. Okay.  So when you got through writing this

```
1          stuff down, what happened to you while you were

2          still waiting for Mr. Upton?

3     A.   Again, they took me back to the original place

4          where they had me.  They made me to wait.  And

5          then after a while, they took me to adjacent

6          building.  And after a little while, Mr. Upton

7          arrived.

8     Q.   When Mr. Upton arrived, what-- what did they do

9          with you?

10    A.   He entered where I was at.  He presented

11         himself saying that his name was Wayne Upton.

12                   THE DEFENDANT:  Or Rusty.

13    A.   Or Rusty.  And he explained to me why I was

14         there.

15    Q.   (BY MR. JONES)  And when he told you-- what did

16         he tell you was the reason you were there?

17    A.   That they received a report that I had

18         falsified some documents and they were looking

19         for me in Mexico.

20    Q.   And did you-- did you reply to him when he told

21         you that?

22    A.   Yes.

23    Q.   What did you say to him?

24    A.   I know what you're talking about, the only one

25         that's falsifying documents is my ex-husband.
```

1   Q.  And when you-- when you said that, were you

2        saying that-- that Miguel had falsified those

3        particular documents?

4   A.  No, because I have not seen those documents

5        that he had.  He told me that they were waiting

6        up-- they were waiting for a person that was

7        going to bring them from Ojinaga.

8   Q.  Okay.  And-- and then-- so he didn't give you

9        the documents to-- to look at when he first

10       walked into the room?

11  A.  Not yet.

12  Q.  Did he ever present those documents to you to

13       read?

14  A.  Yes.

15  Q.  How much-- how much later?

16  A.  About 15, 10, 15 minutes later.

17  Q.  And what did-- what happened in this 10 or

18       15 minutes between you telling him that Miguel

19       is the person who falsifies documents and-- and

20       him bringing the document in for you to read?

21  A.  As we were waiting for the documents, agents

22       would go in and out because their-- the waiting

23       room where I was at, next door there was more

24       like a refreshment area for refreshments.  And

25       above the refrigerator there was a box of

1       candies.  And he told me that one of the agents

2       sells candies.

3  Q.  There was no more conversation between you

4       and-- and the officials while you were waiting

5       on the documents?  And when I say conversation,

6       I'm talking about conversation concerning why

7       you were there under arrest.

8  A.  No, until the documents arrived.

9  Q.  Okay.  Tell me when the documents arrived

10      what-- what happened between the--

11  A.  Mr. Upton opened the package of documents and

12      showed me some certificates.  He told me, "Did

13      you falsified that?"  And I answered no.  And

14      he asked me again, "Those documents, do they

15      appear false, yes or no?"  And I answered they

16      do appear that they have been altered.  Then he

17      explained to me that I could continue talking

18      with him or I could call an attorney if I had

19      one.  I told him that I saw one in Mexico, but

20      that I also had an-- had one here in the United

21      States that worked with my divorce.  So he

22      asked me which of the two do you want to call,

23      so I answered to that I want to call the one in

24      the United States.

25  Q.  After-- after you-- you finished making your

1      telephone call, you told him that you didn't

2      want to talk to him anymore?

3  A.  Before making the call.

4  Q.  Okay.  After-- after you-- you made the call,

5      were you permitted to leave or-- or were you

6      taken somewhere?

7  A.  Two agents arrived and Mr. Upton informed me

8      that I was detained officially.  So then he

9      turned to the agents and he said, "My weekend

10     has been ruined because I had plans to go to

11     Odessa with my family."

12 Q.  Okay.  Did the two officials take you away?

13 A.  They handcuffed me and they took me.

14 Q.  Upton was not one of the ones that took you?

15 A.  No.

16 Q.  When did the next-- the next time you saw Mr.

17     Upton?

18 A.  Monday.

19 Q.  And what were the circumstances under seeing--

20     on seeing Mr. Upton?

21 A.  Him and the two officers were there to transfer

22     the ones from the prison to Alpine.  From that

23     prison to another federal prison.

24 Q.  So they transferred you on Monday from one

25     prison to another?

1    A.   We went to court.

2    Q.   Did you have conversation with Agent Upton that

3         day?

4    A.   Yes.

5    Q.   What-- what did the two of you talk about?

6    A.   As we were waiting for the other one that was

7         also on the list to go to court, I asked him to

8         forgive me to-- because I ruined your weekend

9         with your family.  So he told me there's no

10        problem, I used the weekend to work in church

11        doing confirmations for children.

12             During the weekend he said that he talked

13        to my ex-husband, that he had an interview with

14        him.  So I asked him if I was in problems, if

15        there's any dispute about my citizenship.  So

16        then my ex-husband is also going to be in

17        problems because he-- he got his legal papers

18        through me.  And so Mr. Upton told me that

19        there was absolutely no problem because--

20             MR. HOUGH:  Judge, we'll object, this

21        is all irrelevant.

22             THE COURT:  Mr. Jones, let me ask

23        you, can't we cut through a lot of this?  Are

24        we going to follow the-- the legal procedures,

25        everything until we get her back to the United

1      States?  Is that necessary?  Can't we sum this

2      up and--

3              MR. JONES:  Yes.  Yes, we can, Judge.

4              THE COURT:  Let's-- let's try it,

5      because we're going to be spending the rest of

6      our lives here I'm afraid.

7  Q.  (BY MR. JONES)  Where is passport number

8      Z6840500?

9              INTERPRETER BRACAMONTE:  What number

10     is that?

11            MR. JONES:  C-- C-- excuse me,

12     Z6840500.

13  A.  It's been destroyed.

14  Q.  (BY MR. JONES)  Why did you destroy passport

15     Z6840500?

16  A.  It expired.  So when I received the new one, I

17     decided to destroy the old one because I've

18     heard a lot about theft identity.

19  Q.  Have you ever used someone else's passport?

20  A.  No.

21  Q.  Have you ever taken the passport that-- that

22     you were issued and altered it in any way?

23  A.  No.

24  Q.  The-- the passport that you got as a

25     replacement for Z6840500, where is it now?

1    A.  It's under the Court custody.

2    Q.  In the office of the lady seated at the-- in

3        the office where the lady seated at the end of

4        the-- in front of the computer sits?

5    A.  Yes.

6    Q.  Have you ever purchased a counterfeit passport?

7            MR. HOUGH:  Objection, irrelevant.

8            THE COURT:  Well, let's clear it up.

9    Go ahead.

10   A.  No.

11   Q.  (BY MR. JONES)  As a matter of fact, where was

12       the passport that-- the replacement passport in

13       March of 2004 when you returned from-- from

14       Camargo, returned to the United States from

15       Mexico?

16   A.  The one that was replaced?

17   Q.  Yes.  Where-- where was it at the-- at the time

18       you crossed back into the United States?

19   A.  At home.

20           MR. JONES:  That's all the questions

21       I have, Your Honor.

22           THE COURT:  Well, ladies and

23       gentlemen, I think maybe that's all the

24       evidence we can take today.  You-- you may step

25       down and-- and we'll-- I think all we can do is

1    come back at 9:30 in the morning and hear

2    further testimony.  And I hope we can perhaps

3    finish this case up tomorrow.  But is 9:30

4    agreeable to both attorneys here?  We'll--

5             MR. HOUGH:  Yes, Judge.

6             THE COURT:  We'll see you at 9:30 in

7    the morning, remember my admonition.  Mr.

8    Bailiff.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1     UNITED STATES OF AMERICA  )
                                )    ss:
2     DISTRICT OF KANSAS        )
```

3                    C E R T I F I C A T E

4          I, KELLI STEWART, Certified Shorthand

5     Reporter in and for the State of Kansas, do

6     hereby certify that I was present at and

7     reported in machine shorthand the proceedings

8     had the 28th day of August, 2006, in the

9     above-mentioned court; that the foregoing

10    transcript is a true, correct, and complete

11    transcript of the requested proceedings.

12         I further certify that I am not attorney

13    for, nor employed by, nor related to any of the

14    parties or attorneys in this action, nor

15    financially interested in the action.

16         IN WITNESS WHEREOF, I have hereunto set

17    my hand and official seal at Topeka, Kansas,

18    this _____ day of _____, 2006.

19

20

21

22              /s/ Kelli Stewart

23              KELLI STEWART

24              Certified Shorthand Reporter

25