1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF KANSAS
2                     TOPEKA, KANSAS

3

   UNITED STATES OF AMERICA        )
4  -------------------Plaintiff,   )
                                   )
5            vs.                   ) Case No.
                                   ) 05-40126-01-RDR
6  DIANA VELIA GUYTON,             )
   -------------------Defendant.   )
7

8


9    PARTIAL TRANSCRIPT OF JURY TRIAL CONSISTING OF
             VOLUME II OF THE TESTIMONY OF
10                 DIANA VELIA GUYTON
                        BEFORE
11            HONORABLE RICHARD D. ROGERS
                          on
12                 August 29th, 2006

13

       APPEARANCES:
14     For the Government:    Mr. Gregory G. Hough
                             Asst. U.S. Attorney
15                           290 Federal Building
                             444 Quincy Street
16                           Topeka, Kansas   66683

17     For the Defendant:    Mr. Richard Jones
                             Jones Law Office
18                           1503 Southeast Quincy
                             Topeka, KS 66612
19

20     Court Reporter:       KELLI STEWART, RPR, CRR, RMR
                             Nora Lyon & Associates
21                           2300 S.W. 29th St., Ste 121
                             Topeka, Kansas   66611
22

23

24

25

1                       I  N  D  E  X
        Certificate-------------------- 161
2
                     W I T N E S S E S
3    ON BEHALF OF DEFENDANT:                    PAGE
     DIANA VELIA GUYTON
4    Cross Examination by Mr. Hough          109
     Redirect Examination by Mr. Jones       150
5    Recross Examination by Mr. Hough        154

6    DIANA VELIA GUYTON (REBUTTAL CASE)
     Direct Examination by Mr. Jones         157
7    Cross Examination by Mr. Hough          159

8

9
                     E X H I B I T S
10   GOVERNMENT EX. NO.:      OFFERED      RECEIVED
                         None
11

12

13   DEFENDANT EX. NO.:       OFFERED      RECEIVED
                         None
14

15

16

17   (PLEASE NOTE:  When the Defendant answers in

18   English, "THE DEFENDANT" is placed in colloquy

19   in the transcript.  Otherwise all answers are

20   given through the interpreter).

21

22

23

24

25

```
1              THE COURT:  All right.  I believe
2        we're now ready for cross-examination.
3              MR. HOUGH:  Thank you, Your Honor.
4                    CROSS-EXAMINATION
5        BY MR. HOUGH:
6    Q.  Good morning, ma'am.
7    A.  Good morning.
8    Q.  Ma'am, you agree that you applied for a United
9        States passport.  Correct?
10   A.  Yes, it was.
11   Q.  And you agree that you then renewed that
12       passport application in March of 2004.
13       Correct?
14   A.  Effectively, yes.
15   Q.  And you agree that in the application, the
16       original application, you indicated that you
17       were a United States citizen.  Correct?
18              INTERPRETER BRACAMONTE:  Counselor,
19       if you could for the interpreter, can you
20       please repeat that question?
21              MR. HOUGH:  Sure.
22   Q.  (BY MR. HOUGH)  In the original application,
23       you indicated that you were a United States
24       citizen?
25   A.  Correct.
```

1    Q.  And you indicated in the original application

2        that your place of birth was Ojinaga,

3        Chihuahua, Mexico.  Correct?

4    A.  Ojinaga, Chihuahua, effectively.

5    Q.  And in the renewal application in March

6        of 2004, you again indicated you were a United

7        States citizen.  Correct?

8              MR. JONES:  Greg, so that we don't--

9        so we can go forward, you said March of 2004, I

10       think you meant to say 2002.

11             MR. HOUGH:  That's correct.  Thank

12       you.

13   Q.  (BY MR. HOUGH)  In the re-application, the

14       renewal, you indicated that you were a United

15       States citizen.  Correct?

16   A.  That's correct.

17   Q.  And you also indicated again in that document

18       that you were born in Ojinaga, Chihuahua,

19       Mexico?

20   A.  It was like that.

21   Q.  And do you agree that on April the 20th of 1992

22       that you received your United States passport

23       renewal?  Or no, the original, I'm sorry, the

24       original, in '92.

25   A.  What do you mean original?

1    Q.   The first application.

2    A.   The first application or the first passport?

3    Q.   The first passport, you actually received that

4         in April of '92.

5    A.   The first one was returned after I received the

6         second, which is now.

7    Q.   You actually received a passport upon-- and

8         based upon your original application.  Correct?

9    A.   It's not clear to me when you're saying it's

10        based on the original application.

11   Q.   Do you agree that in 1992 you received a United

12        States passport?

13   A.   Effectively, I did receive one that's

14        up-to-date, but the other one went back, was

15        returned back.

16   Q.   Subsequently in 2002, you received the renewed

17        passport.  Correct?

18   A.   Basically, yes.

19   Q.   And you agree that you applied for an

20        unrestricted Social Security card.  Correct?

21   A.   I never have had a unrestricted as far as I

22        know.

23              THE DEFENDANT:  A restricted one.

24              INTERPRETER BRACAMONTE:  The witness

25        says restricted one.

1   Q.  (BY MR. HOUGH)  Do you recall the testimony of

2       Agent McKimmons from the Social Security

3       Administration that testified here?

4   A.  I remember, but not everything what was said,

5       not literally, but I do remember some things.

6   Q.  Do you recall him testifying that you received

7       a unrestricted Social Security card based upon

8       your application?

9   A.  I did have one.

10   Q.  Okay.  And you agree that you made an

11       application and that you subsequently received

12       a Social Security card based upon that

13       application in August of 2001?

14   A.  I cannot tell you exactly the date when I

15       received it.

16   Q.  Do you recall that Agent McKimmons indicated

17       that it was August the 2nd of 2001 in his

18       testimony?

19   A.  I don't remember exactly the date.

20   Q.  If that were, in fact, his testimony, would you

21       have reason to dispute it?

22   A.  I cannot dispute what I cannot remember

23       exactly.  And I cannot argue which I am not

24       sure 100 percent.

25   Q.  Do you recall in your application for the

1      Social Security card stating your place of

2      birth as Ojinaga, Mexico?

3  A.  As far as I know, I've always stated that way,

4      that Ojinaga, Chihuahua, Mexico is my birth of

5      place.

6  Q.  Thank you.  Do you recall that in that

7      application for a Social Security card you

8      presented your passport, your United States

9      passport as an identification document?

10  A.  I do recall.

11  Q.  Okay.  You indicated on direct-examination that

12      in March of 2004 you took your children and one

13      son's now-wife to Mexico for spring break.  Do

14      you recall that testimony?

15  A.  It was like that.

16  Q.  And you indicated on direct-examination that

17      you were headed for Camargo in Chihuahua,

18      Mexico.  Correct?

19          (THEREUPON, the interpreter began

20      intrepreting the question).

21          THE DEFENDANT:  Camargo.

22          (THEREUPON, the interpreter concluded

23      interpreting the question).

24  A.  Effectively.

25  Q.  (BY MR. HOUGH)  You indicated that at the

1        border you were asked for papers and passport

2        and where you were going.  Correct?

3  A.  Upon returning or entering Mexico?

4  Q.  My understanding was that it was both.  Is that

5        not correct?

6  A.  As I enter into Mexico, I did get a permit for

7        my vehicle and the persons that were in the

8        vehicle.

9  Q.  You had to declare where in Mexico you were

10       going.  Correct?

11  A.  Not necessarily, only to the interior of the

12       country.

13  Q.  Isn't it true that if you're traveling beyond

14       the 25-mile zone into the interior of Mexico,

15       that it requires a passport of a United States

16       citizen?

17  A.  24 kilometers.

18            MR. HOUGH:  Kilometers.

19  A.  Kilometers from the entrance.

20            MR. HOUGH:  Okay.  I'm not good at

21       metric, either, so--

22  A.  The kilometers, they're shorter than the miles.

23  Q.  (BY MR. HOUGH)  Thank you.  And Camargo is

24       about 180 miles from the border.  Correct?

25  A.  234 kilo--

1              THE DEFENDANT:  Kilometers.

2    A.  Kilometers from Ojinaga approximately.  130 to

3        140 miles approximately.

4    Q.  (BY MR. HOUGH)  Okay.  And you would agree,

5        then, that that would have required a passport

6        upon your declaration that that's where you

7        were heading when you were talked to at the

8        border.  Correct?

9    A.  Not necessarily.

10   Q.  You indicated on direct-examination that you

11       had a conversation with Agent Upton that day in

12       March of 2004.  Do you recall talking about all

13       of that?

14   A.  Specifically what do you mean "conversation"?

15   Q.  Okay.  Do you recall testifying on

16       direct-examination that Agent Upton in the

17       beginning of the conversation indicated to you

18       that they were looking for you in Mexico

19       regarding falsification of documents.  That was

20       your testimony.  Correct?

21   A.  I can try to have the intention to try to

22       remember the words.

23   Q.  You recall testifying essentially to that

24       during your direct-examination?

25   A.  He did mention something about that.

1    Q.  And you testified here yesterday that, in your

2        words at the time, you told Agent Upton, "I

3        know what you're talking about.  Miguel would

4        be responsible for that."  Do you recall that

5        testimony?

6    A.  There's a confusion that I would like to clear

7        up.

8    Q.  Ma'am, that's not your opportunity now.

9                MR. HOUGH:  I would ask that the

10    witness be directed to answer my question, Your

11    Honor.

12             THE COURT:  Well, I can't tell

13    whether she's doing it or not, but please

14    answer his question.

15    A.  It was not exactly like that.

16    Q.  (BY MR. HOUGH)  Okay.  Thank you.  You-- do you

17        recall indicating yesterday that Agent Upton

18        showed you a package with documents?

19    A.  Yes.

20    Q.  At that time you testified here yesterday that

21        you denied falsifying those documents or

22        knowing anything about them.  Correct?

23    A.  Yesterday I did-- I denied saying about-- that

24        I-- that it was I that did the falsification of

25        the documents, but I did not say that I did not

1    know anything about that, I said I did know

2    about that.

3  Q.  Thank you.  And upon looking at those

4    documents, you testified yesterday that you

5    told Agent Upton, yes, those appear to be

6    altered documents.  Do you remember that

7    testimony?

8  A.  Now when he said that it seemed like they had

9    been altered, those documents, then I said,

10    "Yes, it does seem that way."

11  Q.  Thank you.  You remember testifying yesterday

12    that you were unaware of any Camargo birth

13    certificate for you until last year?

14  A.  Yes, that is.

15  Q.  Are you understanding the questions that I'm

16    asking in English?

17  A.  The majority, yes.

18  Q.  Okay.  Just wondering if as a matter of

19    expedience if you feel the interpreter

20    necessary right now?

21  A.  I know that I have that right and I would like

22    for that to be facilitated to me.

23  Q.  Thank you.  Now, you indicated that you recall

24    the testimony yesterday about being unaware of

25    this Camargo birth certificate until last year.

1          And you indicated that you first became aware

2          of it when I provided documents to you and your

3          attorney during discovery in the case.

4    A.   Yes, it was.

5    Q.   Okay.  And you also testified yesterday about

6          your awareness of the charges in the country of

7          Mexico, which was Government's Exhibit 16 that

8          was admitted in this case.  Do you recall that?

9    A.   Of course.  I do recall that because those

10         charges were not carried out and they were

11         dismissed.

12   Q.   And you were aware of the charges, they

13         provided you a copy of the charges and you

14         testified you had an attorney in Mexico on

15         those charges.

16   A.   Yes.

17   Q.   And attached to and as an exhibit in

18         Government's Exhibit 16, that very charging

19         document appears that very Camargo birth

20         certificate.  Correct?  There it is.  Correct?

21   A.   It's in this, it's in this package, but it's

22         not in the package that was given to me.

23   Q.   Oh.  Thank you.  You indicated yesterday that

24         certain documents that you received that were

25         provided to you, you obtained by placing a

```
 1        phone call to two friends in Mexico.  Correct?
 2   A.   Are you referring to the two birth certificates
 3        that I received from the two friends in Mexico
 4        when we began this trial?
 5   Q.   It's my understanding that those were the only
 6        documents about which you testified yesterday;
 7        one from Professor Salinas and one from Ms.
 8        Armendariz.
 9               INTERPRETER BRACAMONTE:  Who's the
10        other?  I'm sorry, counsel.
11               MR. HOUGH:  Ms. Marie Elena
12        Armendariz.  Armendariz.
13   A.   Effectively, I did receive as a favor from
14        Falcon Salinas.
15   Q.   (BY MR. HOUGH)  Okay.
16   A.   That he-- that those certificates were there.
17        But going back to a year, I don't know.
18   Q.   Thank you.
19   A.   And Marie Elena Armendariz, she did provide it,
20        other copies of birth certificates which had
21        annotations.
22   Q.   You didn't go there, you made a phone call to
23        each of those two people.  Correct?
24   A.   That's the way it happened.
25   Q.   And for a favor, they obtained those documents
```

1      for you.  Correct?

2   A.  Yes.

3   Q.  Now, you testified yesterday that you altered a

4      birth certificate and a marriage license at a

5      time when you were in high school; is that

6      correct?

7   A.  Effectively.

8   Q.  Okay.  Those documents appear in this record as

9      Government Exhibit's 1.  And that would be the

10      certificate of matrimony that is on the

11      overhead regarding Samuel Ross Guyton and your

12      mother, Alicia Chavira-Chavira.  Correct?

13   A.  That's the one.

14   Q.  Okay.  And the changes were changing July to

15      May and changing the year to '65.  Correct?

16   A.  Effectively, that was the correction.

17   Q.  And you also changed the name-- or excuse me,

18      the ages of your mother and father.  Correct?

19   A.  The correct ages, but not the names.

20   Q.  Thank you.  And I believe that your testimony

21      was that the other document was Government's

22      Exhibit No. 7, the Ojinaga birth certificate

23      where you changed this and this that I'm

24      circling; is that correct?

25   A.  Correctly.

1    Q.  And you testified that you did this because of

2        your mother's depression.  Correct?

3    A.  During a period of time of Mother's depression,

4        yes.

5    Q.  And you indicated that --

6                INTERPRETER BRACAMONTE:  The witness

7        has something else.

8    A.  It was her disposition.

9    Q.  (BY MR. HOUGH)  Thank you.  And you indicated

10       this was during your first year of high school.

11       Correct?

12   A.  Yes.

13   Q.  So you would have been 16.  Correct?

14   A.  15.

15   Q.  15.  So this would have been in about 1980.

16       Correct?

17   A.  More or less.

18   Q.  Okay.  And Samuel Guyton died in 1977.

19       Correct?

20   A.  Correctly, and that was in October.

21   Q.  And you're telling the jury that this was a

22       three-year depression about the death of your

23       father that caused you to alter these

24       documents; is that correct?

25   A.  Mother's stage of depression was more than

1        three years.

2    Q.  Thank you.  Now, you testified that you were

3        walking to school with a friend and just walked

4        in to City Hall that day; is that correct?

5    A.  Correctly.

6    Q.  And you testified that you walked up and asked

7        for the marriage book and asked for the birth

8        certificate book.  Correct?

9    A.  I requested the certificates.

10    Q.  So they handed you the certificates out of the

11        book as opposed to giving you the book.

12        Correct?

13    A.  May I repeat the process?

14    Q.  You may answer the question.  Did they hand you

15        the book or a certificate that you altered?

16    A.  First of all, they gave me the book so I could

17        look for the record, specific record.

18    Q.  Okay.  But when you made these changes--

19                INTERPRETER BRACAMONTE:  And the

20        witness said...

21    A.  Two days later.  And that's when I received

22        exactly the certificates that I requested.

23    Q.  (BY MR. HOUGH)  Ma'am, let me ask you this;

24        Exhibit 7 that you just testified about that

25        you altered, did you alter that by receiving

1    the book or by receiving the certificate and

2    then altering it?

3 A.  When-- the book was given to me so I could look

4    specifically for the certificates.  And then

5    they told me, indicating to go sit down to the

6    other side of the waiting room so personally I

7    could look for the certificates.

8 Q.  So you took the book with you.  You found the

9    certificate.  Correct?

10 A.  I found them in the book.

11 Q.  Okay.  Thank you.  And that would be true both

12    of the birth certificate and the marriage

13    license.  Correct?

14 A.  Correct.

15 Q.  And you indicated your friend was with you.

16    Correct?

17 A.  That's correct.

18 Q.  And you indicated that they didn't ask you for

19    any identification.  Correct?

20 A.  That's correct.

21 Q.  And you indicated that at age 15 they just gave

22    you the book and let you go make the changes.

23    Correct?

24 A.  That's the way it happened.

25 Q.  Do you recall the testimony of Mr.

```
1        Treviso-Ortiz?

2    A.  The majority part.

3    Q.  Do you recall that he indicated that he was

4        essentially the Director of the Civil Registry

5        at Ojinaga?

6    A.  Yes, in the recent years.

7    Q.  Do you recall his testimony about the procedure

8        in that office being essentially unchanged

9        since even before 1965?  Do you recall that

10       testimony?

11   A.  I remember what he said and I remember what I

12       saw when he did not live in Ojinaga.

13   Q.  Thank you.  Now, you also testified on

14       direct-examination yesterday that when you made

15       your original application for a citizen

16       passport, this was done at Juarez; is that

17       correct?

18   A.  All the process was done in the American

19       consulate in the city of Chihuahua.

20            THE DEFENDANT:  Juarez, Chihuahua.

21            INTERPRETER BRACAMONTE:  Juarez,

22       Chihuahua.

23   Q.  (BY MR. HOUGH)  So I was correct, it was

24       Juarez, Chihuahua?

25   A.  Effectively.  Juarez, Chihuahua.
```

1   Q.  And you testified that when you went there in

2       early 1992, that the process had been ongoing

3       for two years is what you told Mr. Jones.  Do

4       you remember that?

5   A.  My mother-- my mother had-- had already began

6       the process, but I cannot tell you exactly how

7       many years when that was taken place.

8              THE DEFENDANT:  Many times.

9              INTERPRETER BRACAMONTE:  And the

10      witness says many times.

11  Q.  (BY MR. HOUGH)  You don't recall testifying

12      yesterday that the process had been ongoing for

13      two years; is that correct?

14  A.  The process had had more than two years and

15      it-- it was initiated many times.

16  Q.  Okay.

17  A.  And it was left alone and then it was initiated

18      again.  For what reason, I do not know.

19  Q.  And when you re-initiated it then in April of

20      '92, you had been working for the prior

21      year-and-a-half for Professor Benitez.

22      Correct?

23  A.  I cannot recall exactly when was the last time

24      it re-initiated the process.

25  Q.  Thank you.  Yesterday during your testimony you

1    identified Exhibits 4, 5, and 6.  Do you recall

2    that?

3  A.  Yes.

4  Q.  And you-- and you testified that those were

5    payroll records that you have had in your

6    possession since at least 1991.  Correct?

7  A.  Effectively.  Since July, 1991.

8  Q.  And you moved from Mexico to Great Bend in that

9    period of time.  Correct?

10 A.  August.

11 Q.  And you also then moved in that period of time

12    between '91 and yesterday from Great Bend to

13    Topeka.  Correct?

14 A.  July 1st, 1994.  That's when we arrived in

15    Topeka.

16 Q.  And each time you had to pack up everything and

17    move wholesale.  Correct?

18            INTERPRETER BRACAMONTE:  I'm sorry,

19    counselor.

20 Q.  (BY MR. HOUGH)  Each time you had to pack up

21    everything and move it all, first to Great

22    Bend, then to Topeka.  Correct?

23 A.  Many of my belongings, they have always been

24    packaged.

25 Q.  And it's your testimony that those documents

1      are part of documents moved all the way up

2      through Mexico and you've maintained.  Correct?

3  A.  This with many important documents.

4  Q.  What is the--

5  A.  They've always-- they've always been in the

6      file of my husband, which also were mine.

7  Q.  Okay.  Those documents are dated what, May

8      through June of what year?

9  A.  One of the payroll is from May 16th all the way

10     to 31st.

11 Q.  What year?

12 A.  1992.

13 Q.  Thank you.  Now--

14          MR. JONES:  No, there was a-- there

15     was a--

16          MR. HOUGH:  Do you have an objection?

17          MR. JONES:  I'm not sure how you make

18     this objection, but ask the question again as

19     to the date because he said one thing and she

20     said another.

21 Q.  (BY MR. HOUGH)  Were you unclear on the date?

22     What's the date of the document?

23          THE DEFENDANT:  (Answers in Spanish

24     to the interpreter).

25 Q.  (BY MR. HOUGH)  I'm sorry, I don't mean to

1    interrupt, but is there a year date on those

2    three documents?  You indicated previously

3    1992, your attorney indicated it had to have

4    been another year.

5  A.  Besides the payroll, there's no other date.

6  Q.  Okay.  Thank you.  And do you recall Professor

7    Benitez being shown those very documents during

8    his testimony in front of this jury.  Correct?

9  A.  Yes.

10  Q.  And you recall that he told this jury that

11    those documents were stolen from the Government

12    of Mexico.  Correct?

13            THE DEFENDANT:  (Answers in Spanish

14    to the interpreter).

15            MR. HOUGH:  Judge, I would object and

16    ask the witness to be directed to answer the

17    question.  Although I don't understand Spanish,

18    called for a simple yes or no answer relative

19    to the professor's testimony and it did not

20    require this narrative.  So I would ask the

21    Court to direct again the witness to answer my

22    questions.

23            THE COURT:  I will direct you to

24    please-- please answer his questions.

25  Q.  (BY MR. HOUGH)  Thank you.  I'll ask you again,

1          do you recall that Professor Benitez, shown

2          those documents, told this jury that those were

3          stolen from the government of Mexico.  Correct?

4     A.   I do remember that the professor was shown

5          those documents.

6     Q.   Thank you.

7     A.   I do recall, but he did not say when they were

8          stolen.  He did not say if they were stolen

9          before or after when these copies were made.

10    Q.   So you recall him testimony-- his testimony

11         that the documents were stolen.  Correct?

12    A.   He said these, all the file of the treasury was

13         stolen.

14    Q.   Oh, thank you.

15              THE DEFENDANT:  (Speaks Spanish).

16    Q.   (BY MR. HOUGH)  There's no question before you.

17         Now, yesterday you offered exhibits--

18              INTERPRETER BRACAMONTE:  The witness

19         said another thing.

20    A.   I did not finish that answer.

21    Q.   (BY MR. HOUGH)  You answered the question.

22         Thank you.  You provided yesterday a document

23         that you indicated was your letter of

24         resignation.  Correct?

25    A.   Correct.

1    Q.  And that is Defendant's Exhibit 24.  Correct?

2    A.  Yes.

3    Q.  And it was offered and it was admitted before

4        the jury.  Correct?

5    A.  Yes.

6                MR. HOUGH:  Your Honor, this document

7        is in Spanish.  We have our court-approved

8        interpreter here.  I would ask that this

9        document, which has not previously been

10       published to the jury, be published to the jury

11       by the interpreter reading it into the record.

12               THE COURT:  All right.  That will be

13       done.

14               INTERPRETER BRACAMONTE:  City,

15       Ojinaga, Chihuahua.  July 15th, '91.  Professor

16       Jose Jesus Rodriguez-Benitez, Mayor, City Hall,

17       City.  Through this means, I allow myself to

18       present to you my formal resignation with

19       irrevocable character since-- since the

20       conditions arrived about my work which is a

21       result of inconvenience--

22               THE DEFENDANT:  Inconvenience.

23               INTERPRETER BRACAMONTE:  -- for my

24       interests.  I should manifest to you my ample

25       gratitude of the opportunity that was given to

1    me to be a co-worker.  Plus, my appreciation is

2    incomparable since all that I have learned as a

3    person - good or bad - it's been your teaching.

4    It's been for my matureness, first of all, and

5    it's formed basis for my determinations.

6    Sincerely, Diana Velia Guyton-Chavira.

7              MR. HOUGH:  Thank you.

8    Q.  (BY MR. HOUGH)  And your testimony yesterday

9    was that 32 days after that document was

10    submitted, you married Miguel-- is it Giner?

11              THE DEFENDANT:  Giner.

12    Q.  (BY MR. HOUGH)  Giner; is that correct?

13    A.  Yes.

14    Q.  Thank you.  You also offered Defendant's 25,

15    which you submitted was a letter of

16    recommendation; is that correct?

17    A.  That's correct.

18    Q.  That is a form, is it not, a fill-in-the-blank

19    form?  And there appears different type from

20    the form to what is filled in.  Correct?

21    A.  You're correct, it's a form that needs to be

22    filled out.

23    Q.  Okay.  Thank you.  May I see that?  And on this

24    document which you've offered up yesterday,

25    there appears right here Liquid Paper typed

1        over.  Correct?

2    A.  That's correct.

3    Q.  And here again Liquid Paper which has been

4        typed over.  Correct?

5    A.  That's correct.

6    Q.  And on this Exhibit 25, there is a seal right

7        above the exhibit sticker.  Correct?

8    A.  That's correct.

9    Q.  And that seal is identical to the seal which

10       appears on Government's Exhibit 4.  Correct?

11       And there they are side-by-side.  Correct?

12   A.  It's-- it's exactly the same thing that was in

13       that department to the other department,

14       because in the city hall all departments have

15       the same seal.

16   Q.  So it's the same seal, the answer to my

17       question was yes?

18   A.  Yes, it is, because that's the same with all

19       the others.

20   Q.  Thank you.  So the seal on 25 is identical in

21       all respects to the seal on the documents that

22       the professor indicated were stolen.  Correct?

23   A.  I cannot tell you if it's the same seal because

24       the-- the-- each department had a seal, the

25       same kind of seal, so I cannot tell you if it's

1    the same seal because the Professor Benitez had

2    his own seal in his pocket.

3 Q.  Thank you.  And again, we're referring to

4    Defendant's Exhibits 4, 5, 6 and 25.  Correct?

5 A.  These are the exhibits.

6 Q.  Thank you.

7 A.  4, 5, 6 and 25.

8 Q.  That you provided the Court yesterday.

9    Correct?

10 A.  That the judge did accept as evidence

11    yesterday, yes.

12 Q.  Thank you.  Now, you testified about your role

13    in the mayor's office yesterday.  Do you recall

14    that testimony?

15 A.  Yes.

16 Q.  And you showed us pictures of the building and

17    of the interior of the atrium of that building.

18    Correct?

19 A.  Yes.

20 Q.  And you testified that, among other things, in

21    the Civil Registry marriage licenses and birth

22    certificates were prepared and filed.  Correct?

23 A.  Yes.

24 Q.  And you testified that you did not work in the

25    Civil Registry ever and you didn't deal with

1          birth certificates or marriage licenses.

2          Correct?

3      A.  I did not work in the Civil Registry and I did

4          not handle none of those certificates and also

5          I did not place in writing besides performing

6          marriages.

7      Q.  Thank you.  So you did perform marriages as you

8          admitted yesterday.  Correct?

9      A.  That's correct.

10     Q.  And you recall Professor Benitez' testimony

11         about all of the things that you did relative

12         to the Civil Registry.  Correct?

13     A.  I remember what he said.

14     Q.  So you're telling this jury that he was

15         mistaken?

16     A.  He was lying.

17     Q.  Thank you.  Now, you showed a photograph the

18         other day and you indicated that there was a

19         lady in there, Ms. Munoz-Munoz.  Correct?  Is

20         that correct?

21     A.  It could be Marie Angelita Munoz.

22              THE DEFENDANT:  It was Angelita Munoz

23         or Marie de Los Angeles Munoz.

24     A.  Angelita Munoz or Marie de Los Angeles Munoz,

25         which is her legal name.

1    Q.  (BY MR. HOUGH)  This lady right there in the

2        picture with the arrow on, what's her name?

3    A.  Now, Marie de Los Angeles Munoz or Angelita

4        Munoz.

5                    INTERPRETER BRACAMONTE:  And the

6        witness mentioned other names.

7    Q.  (BY MR. HOUGH)  Okay.  And this for the record

8        is in the photograph, Defendant's Exhibit 23.

9        Correct?

10   A.  Yes.

11   Q.  And you indicated that she worked in the Civil

12       Registry in the building that you drew the

13       diagram for.  Correct?

14   A.  Yes.  She was one of the secretaries of the

15       Civil Registry with the other secretary.

16   Q.  And she is the godmother to your twins.

17       Correct?

18   A.  It's the godmother of one of the twins, the

19       son, the twin.

20   Q.  Thank you, I stand corrected.  And--

21                    INTERPRETER BRACAMONTE:  You said

22       corrected?

23                    MR. HOUGH:  Corrected.  I stand

24       corrected.  Does that not interpret well?

25   Q.  (BY MR. HOUGH)  On the diagram that you drew,

1      second floor, circled in red, lower left would

2      be what you described as your desk area.

3      Correct?

4   A.  Exactly.

5   Q.  And circled in red above that is the Civil

6      Registry area.  Correct?

7   A.  That's correct.

8   Q.  And that's where Ms. Munoz-Munoz worked.

9      Correct?

10  A.  Angelita and Ramona worked there.

11  Q.  And you testified yesterday, let me see if I

12     can find that, that Exhibit 22 showed the

13     doorway into your office.  And that's the

14     doorway there.  Correct?

15  A.  Yes, it is.

16  Q.  And your job, among others, was to answer the

17     phone when it rang.  Correct?

18  A.  That's correct.

19  Q.  And then to place those calls to whomever in

20     the building appropriately would handle those

21     issues.  Correct?

22  A.  That's the way it was.

23  Q.  And if you didn't answer that phone, it just

24     rang and rang and rang.  Correct?

25  A.  That's the way it was.

1   Q.  Thank you.  You also indicated and presented

2       documents that were your grade cards.  Correct?

3   A.  That's correct.

4   Q.  And the first one, Defendant's Exhibit 15,

5       which--

6   A.  Yes.

7   Q.  -- it is now on the overhead.  Correct?

8   A.  Yes.

9   Q.  That's for the school year 78-79.  Correct?

10   A.  That's correct.

11   Q.  And Exhibit 16 is for the school year 79-80.

12       Correct?

13   A.  That's correct.

14   Q.  And the final one, Exhibit 17, that you offered

15       from high school is for the year 80-81, 81-82,

16       82-83.  Correct?

17   A.  That's correct.

18   Q.  And again, Sam Guyton died in 1977.  Correct?

19   A.  That's correct.

20   Q.  Prior to any of those documents.  Correct?

21   A.  That's-- it is.

22   Q.  That's what?

23   A.  That's the way it is.

24   Q.  Okay.  Thank you.  Now, you testified about how

25       the other kids in your classes had trouble with

1      your last name during this period of time.

2      Correct?

3   A.  Throughout this time and even before when I

4      tried to go to kinder.

5   Q.  Kindergarten?

6            THE DEFENDANT:  Kindergarten.

7   A.  Kindergarten.

8   Q.  (BY MR. HOUGH)  Thank you.  Now, the

9      Certificate of Baptism that you offered

10     yesterday, Exhibit 18, bears the date of

11     April 24, 1990.  Correct?

12  A.  Correct.

13           MR. HOUGH:  Your Honor, now would be

14     an appropriate time for the morning recess, if

15     the Court please.

16           THE COURT:  All right.  Ladies and

17     gentlemen, let's take a 15-minute break at this

18     time and then we'll come back.  Mr. Bailiff.

19              (THEREUPON, a recess was had).

20           THE COURT:  All right.  Mr. Hough,

21     you may continue.

22  Q.  (BY MR. HOUGH)  Ma'am, in the Camargo birth

23     certificate, Exhibit 3, which you indicated

24     that you were unaware of, bottom left it is

25     signed by one person, Alicia Chavira, your

1      mother.  Correct?

2   A.  Alicia Chavira is my mother.

3   Q.  And you recognize that as her signature.

4      Correct?

5              INTERPRETER BRACAMONTE:  I don't

6      understand the word el laheera (phonetic).

7              THE DEFENDANT:  (Speaks Spanish to

8      interpreter).

9              INTERPRETER BRACAMONTE:  The witness

10      says legible, it should be her mother's

11      signature.

12   Q.  (BY MR. HOUGH)  Is that better?

13   A.  That's better.

14   Q.  Thank you.  And you agree that this document

15      lists no father whatsoever.  Correct?

16   A.  Father's name was not in that space.

17   Q.  Thank you.  And Exhibit No. 5, which was

18      admitted in evidence in this case, which was

19      identified as the Immigration Form I-130, which

20      was filed July the 22nd of '74 by Sam Guyton

21      for your mother.  Correct?  You recall that?

22   A.  When they showed it here as evidence, yes.

23   Q.  Okay.  And you agree that on that document,

24      Samuel Guyton identified you as an adopted

25      daughter.  Correct?  "Diana Velia Guyton,

1       adopted."  Correct?

2   A.  That's what it says.

3   Q.  Thank you.  And in Exhibit No. 4, which was

4       admitted into evidence in this case-- strike

5       that.  Back to Exhibit 5, which I just showed

6       you.  Your father in preparing this document,

7       Samuel Guyton, date and place of marriage,

8       July 26th, 1969.  Correct?

9   A.  That's the date that's there.

10  Q.  And then on Exhibit No. 4, which was admitted

11      as evidence in this case and identified as the

12      INS Form I-130 filed by your father on behalf

13      of Samuel Enrique, Jr., on that document when

14      asked the date of birth-- or, excuse me, the

15      place and present marriage and date, there,

16      too, Samuel Guyton indicated July 26th, 1969.

17      Correct?

18  A.  Effectively, what it says there.

19  Q.  And Exhibit 18, which was admitted into

20      evidence in this case and identified as the

21      marriage license of Curtis Dean Guyton, shows

22      that occurred July 26th of 1969.  Correct?

23  A.  Once again, effectively, that's what it says.

24  Q.  And you recall Curtis Guyton's testimony in

25      this trial.  Correct?

1    A.   Yes.

2    Q.   He testified, among other things, that it was

3         his understanding Curtis-- that you were a

4         niece by adoption.  Correct?

5    A.   I recall my uncle saying, "That is my niece."

6    Q.   You don't recall him testifying that it was his

7         understanding that his brother intended to

8         adopt you?  Do you recall that testimony?

9    A.   What I recall of my uncle saying, "That's my--"

10             THE DEFENDANT:  Niece.

11             INTERPRETER BRACAMONTE:  "That's my

12        niece."

13   Q.   (BY MR. HOUGH)  You don't recall him testifying

14        to his understanding that Sam Guyton intended

15        to adopt you but didn't get it done prior to

16        his death?

17   A.   Sincerely, I don't recall.

18   Q.   Do you recall Exhibit 20, I'll show it here on

19        the overhead again, the affidavit in support

20        that you prepared.  Do you recall that

21        document?  And you see the exhibit number there

22        at the top there, Exhibit 20.

23   A.   I don't recall specifically that document and

24        the process, but I did saw the exhibit.

25   Q.   And it indicates August of 1992 as when you

1      first came to the United States.  Correct?

2   A.  That's exactly what's written.

3   Q.  And you recall Exhibit No. 9 that was admitted

4      into evidence in this case, the death

5      certificate of Sam Guyton.  Do you recall that?

6   A.  Yes.

7   Q.  And it indicates October the 4th of '77 as the

8      date of death.  Correct?

9   A.  That's what's indicated.

10   Q.  And you heard the testimony of Mr.

11      Camacho-Acosta in this trial.  Correct?

12            INTERPRETER BRACAMONTE:  Last name?

13            MR. HOUGH:  Camacho-Acosta.

14   Q.  (BY MR. HOUGH)  The Director of the Civil

15      Registry from Camargo.

16   A.  Yes.

17   Q.  And he testified there's no record of Sam

18      Guyton ever adopting you at Camargo.  Correct?

19   A.  That's correct.

20   Q.  And do you recall the testimony of Mr.

21      Treviso-Ortiz, the Director of the Civil

22      Registry at Ojinaga?

23   A.  Yes.

24   Q.  And he indicated that upon checking, he found

25      no record of Samuel Guyton adopting you either

1     in Ojinaga or Chihuahua.  Correct?

2  A.  That's what he said.

3  Q.  And you have no adoption papers, do you?

4     Correct?

5  A.  I don't.  I have not seen any.

6  Q.  So this, where your father in Exhibit No. 5

7     stated before everyone that you were adopted,

8     that was no more than wishful thinking at the

9     time.  Correct?

10  A.  I cannot say what he was thinking or wishful

11     thinking, my father.

12  Q.  Thank you.  You recall Government's Exhibit

13     No. 6, which was admitted into evidence in this

14     case?

15  A.  Yes.

16  Q.  And you recognize and recall Government's

17     Exhibit 8, which was admitted into evidence in

18     this case.  Correct?

19  A.  Yes.

20  Q.  May I see them, please.  And you recognize that

21     in these documents that your mother, Alicia,

22     tells the Immigration Service that she met Sam

23     Guyton in 1968.  Correct?

24  A.  I cannot recognize that that's what she said.

25     I remember that's what you said what's written.

1    Q.  Let me hand you Government's Exhibit No. 6.

2        Could you please read out loud the highlighted

3        portions.

4              THE DEFENDANT:  "Yes, I worked for

5        about one year in the B-29 Club in Ojinaga,

6        Chihuahua, Mexico.  I worked for about a year

7        in 1968.  I have two children; Diana Velia,

8        born June 14, 1965 in Camargo, Chihuahua."

9    Q.  (BY MR. HOUGH)  And that's all of the

10       highlighted portion?

11    A.  Yes, it is.

12    Q.  And let me hand you Government's Exhibit No. 8.

13       And if you would read out loud the highlighted

14       portion of that document into the microphone

15       that Elias is using so we can all hear you,

16       without it poking you in the forehead.

17           THE DEFENDANT:  "The subject claims

18       that she is married to Samuel Guyton from

19       Odessa-- Odessa, Texas.  She admits to having

20       met him while working in the B-29 bar."

21    Q.  (BY MR. HOUGH)  Bar, okay.  So in these two

22       statements, your mother indicates in 1968 she

23       met Sam Guyton, correct, based upon the

24       highlighted portions you've just read to this

25       jury?

1    A.  That's what I read.

2    Q.  Okay.  And you would agree that you were three

3        years old in 1968, at least in June.  Correct?

4    A.  Yes.

5    Q.  Now, regarding the date of your mother's

6        marriage to Samuel Guyton; again, the Exhibits

7        4, 5 and 18 that you were shown earlier show a

8        date in the official record of June 26th of

9        1969 that that occurred; is that correct?

10   A.  I don't understand your question.

11   Q.  Each of those documents, all of which I showed

12       you within the last five minutes, indicate your

13       mother married Sam Guyton in 1969.  Correct?

14       Look at them again if you have any level of

15       confusion whatsoever.  They're the documents we

16       spoke about five minutes ago.  If you would

17       like, I can put them back on the overhead.

18       Would that be helpful?

19   A.  I'm going to look for the date here.

20   Q.  May I help?

21   A.  Please.

22   Q.  (Indicating).

23   A.  Yes, that's what it says.

24   Q.  And those are the official records that have

25       been provided by the INS and by the Civil

1          Registry.  Correct?

2     A.   From there, that's where you obtained these?

3     Q.   Yes.  Thank you.

4     A.   Then yes, it is.

5     Q.   Thank you.  And, in fact, your Aunt Ina

6          provided us with a lineage, Government-- or

7          excuse me, Defendant's Exhibit 10.  Correct?

8          Is that correct?

9     A.   This is information that I gave to Attorney

10         Jones and he's the one that wrote this.

11    Q.   Okay.  Do you recall in Ina's testimony in this

12         courtroom she indicated that she, too, gave

13         information relative to that document.  Do you

14         recall that?

15    A.   She knows about all this information.  And she

16         also indicated that she saw this document two

17         days earlier before her testimony.

18    Q.   You don't recall her testimony that she

19         provided some information that went into the

20         preparation of the document?

21    A.   She knows about all this information and she

22         has talked to family throughout the years.

23    Q.   You recall her testimony before this jury about

24         her interest in genealogy?

25    A.   Yes.

1          MR. HOUGH:  And Elias' difficulty in

2     interpreting genealogy for us.

3          THE DEFENDANT:  Gneologia.

4          INTERPRETER BRACAMONTE:  Gneologia.

5          THE DEFENDANT:  Genealogy.

6   Q.  (BY MR. HOUGH)  Now, these documents that you

7       have just confirmed contradict documents that

8       you actually filed with the Immigration

9       Service, do they not?

10  A.  Can you be more explicit with your question?

11  Q.  Certainly.  Let me show you Government's

12      Exhibit 11.  Do you recall No. 11, which was

13      admitted into evidence in this case and

14      identified as an INS Form I-130 that you filed

15      for your mother March 19th, 1993 from your

16      A-file.  Do you recall that document?

17  A.  I recall this document and also I do recall the

18      writing of my husband.

19  Q.  Thank you.  And on Exhibit 11, prepared not by

20      Immigration but by you--

21  A.  In reality, it was prepared by my ex-husband,

22      because that's his writing.

23  Q.  On this document from your A-file, the date of

24      your parents' marriage-- or pardon me, your

25      mother's marriage, you list May 26th, 1965 at

1          Ojinaga.  Correct?

2    A.    That's what my ex-husband wrote.

3    Q.    Okay.  In your A-file.

4    A.    If that's part of the A-file, then it is.

5    Q.    Government's Exhibit 13, which was admitted

6          into evidence in this case, identified as the

7          application for certificate of citizenship that

8          you filed.  Do you recall that?

9    A.    I recall.

10   Q.    And in this document you were asked, "your

11         mother and father were married to each other

12         on" and you put what, May 26th, 1965.  Correct?

13   A.    That's correct, what's written.

14   Q.    And in Exhibit 1-A, which also is admitted into

15         evidence in this case and identified as a

16         document you provided and is from your A-file.

17         Do you recall that?

18   A.    Yes.

19   Q.    That document that you provided indicates your

20         parents' marriage occurred May 26th, '65.

21         Correct?

22   A.    In that duplicate copy of birth certificate--

23         or marriage certificate, that's what it says.

24   Q.    Thank you.  At the time that you applied for

25         your Certificate of Citizenship, you presented

```
1        your passport.  Correct?
2   A.   If I don't quite recall.  It was a-- a
3        certified copy.
4   Q.   Thank you.  And, oh, I'm sorry, I forgot,
5        Defendant's Exhibit 10 which you sponsored
6        here, when Ina testified she identified this
7        marriage as 1969.  Correct?
8   A.   That's what she said.
9   Q.   The documents that you have admitted that you
10       altered are documents maintained at the Office
11       of the Civil Registry at Ojinaga.  Correct?
12  A.   That's the way I assume.
13  Q.   And those are documents that the people that
14       work in the Civil Registry have access to.
15       Correct?
16  A.   That's correct.
17  Q.   And when you worked for Mayor Benitez, your
18       desk was here.  Correct?
19  A.   Inside the red circle.
20  Q.   And the Civil Registry was here inside this red
21       circle.  Correct?
22  A.   Correct.
23            MR. HOUGH:  Judge, I have no further
24       questions.
25            THE COURT:  Mr. Jones.
```

1          MR. JONES:  I just have a few.

2                REDIRECT EXAMINATION

3      BY MR. JONES:

4      Q.  In the '70s did your mother read or write

5          English?

6      A.  Mother even now does not read or-- read or

7          write English.

8      Q.  The documents that were documents-- Defendant's

9          Exhibits 4, 5 and 6, which were the payroll

10         records, they were from the-- the middle of May

11         until the end of June of what year?

12     A.  1991.

13     Q.  Did-- did Professor Benitez say that those

14         documents that were there, No. 4, 5 and 6 were

15         stolen?

16     A.  He said these documents.  Well, all the City

17         Hall treasure's file was stolen because--

18         because many--

19              INTERPRETER BRACAMONTE:  If I can

20         inquire, calumeous (phonetic).

21              MR. JONES:  Lies.

22     A.  Lies.  There's three persons in Mexico, the

23         Potrillos, and Diana has friends, those

24         Potrillos, they always wanted to be the mayor.

25     Q.  (BY MR. JONES)  Did he say those specific

1  documents were stolen?

2 A. He said all the file of the City Hall was

3  stolen.

4    MR. HOUGH:  Judge, we'll stipulate

5  that that was his testimony.  Those three

6  documents and others relative to that

7  employment period.

8    THE COURT:  All right.

9 Q. (BY MR. JONES)  Those three documents, 4, 5 and

10  6, are those original documents from the City

11  Hall in Ojinaga?

12 A. They're photocopies of the original.

13 Q. Who copied them?

14 A. The assistant treasurer.

15 Q. And-- and since you received those-- those

16  documents, have they been in-- in-- in the

17  possession of anyone other than you since July

18  the 15th of 1991?

19 A. Of my ex-husband, which is normal.  And my

20  attorney.

21 Q. Did you wind up getting your-- your vacation

22  pay upon taking those-- those documents to-- to

23  the-- to wherever they needed to go?

24 A. Yes, I got paid.  And with that pay I was able

25  to take my mother and brothers to dinner.

1  Q.  On the-- the letter that was like a

2     recommendation, had Liquid Paper on it, why was

3     that Liquid Paper on that document?

4  A.  That was typed by one of the secretaries at the

5     Civil Registry.  She would use a lot of the

6     correctable--

7         THE DEFENDANT:  Liquid Paper.

8         INTERPRETER BRACAMONTE:  Liquid

9     Paper.

10 A.  And-- and also the certificates that she would

11    issue, I'm assuming that she committed a

12    mistake of typing.  And also the name Professor

13    Falcon.  And those forms, they still had the

14    name of engineer Enrique Aleyva.

15        THE DEFENDANT:  Leyva, L-E-Y-V-A.

16 A.  Leyva.  Which he doesn't work at the City Hall.

17    That's why his name had to be removed.

18 Q.  (BY MR. JONES)  Okay.  So as Mr. Hough pointed

19    out, this was a-- a form that had some blanks

20    on it and it was signed by-- and it had at the

21    bottom for the signature of one of the

22    officials, Mr. Leyva, who was no longer working

23    there?

24 A.  His name was there, but the signature is from

25    Professor Falcon.  And the name that was put

1      above the Liquid Paper or correctable.

2   Q.  That's-- that's where they typed in Professor

3      Falcon's name?

4   A.  Yes, it is.

5   Q.  This is Government's Exhibit No. 4.  Had you

6      ever seen this document or-- or Government's

7      Exhibit No. 5, which was the-- it would be the

8      same petition to classify status of alien

9      relative, but while this one is for-- for your

10     little brother, Sammy, there's another one for

11     your-- for your mother.

12  A.  I've seen that here as it's been presented as--

13     as evidence.

14  Q.  Before last year, had you ever seen it?  Before

15     Mr. Hough provided me a copy, had you ever seen

16     it?

17  A.  Never.

18  Q.  And had you ever-- in the one that-- that's for

19     your mother, there was something that said

20     Diana Velia Guyton and it says adopted

21     daughter, that was on the-- on the application

22     for your mother.  Had you ever seen that one

23     before?

24  A.  Never.

25  Q.  And this one that doesn't say adopted, it just

1      says daughter, had you seen this one before?

2   A.  Never before until it was shown to my attorney.

3          MR. JONES:  I have no further

4      questions, Your Honor.

5                  RECROSS EXAMINATION

6   BY MR. HOUGH:

7   Q.  Ma'am, the two alterations that you admit to

8      have made--

9          MR. JONES:  Your Honor, I'm going to

10      object that he's going outside the scope of

11      cross-examination.

12          MR. HOUGH:  Judge, we would submit

13      that this is properly within the scope, and I

14      intend to be very brief.

15          THE COURT:  Say that again.

16          MR. HOUGH:  We would submit that it's

17      within the scope and I intend to be fully

18      brief, very brief.

19          THE COURT:  You may go ahead,

20      overruled.

21   Q.  (BY MR. HOUGH)  Two documents that you admit to

22      having altered, one changed the date of your

23      parents' marriage.  Correct?

24   A.  Only the date.  Only the date.

25   Q.  And-- it changed the date.  Correct?

1   A.  Correct.

2   Q.  And it made it appear that your parents were

3       born prior to your birth in June of 1965.

4       Correct?

5               THE COURT:  You said--

6               MR. HOUGH:  Married, yeah, they were

7       married before you were born.

8               THE COURT:  You said born, I think.

9   Q.  (BY MR. HOUGH)  It made it appear that your

10      parents were married prior to your birth.

11      Correct?

12  A.  Correct.

13  Q.  It would have been totally unnecessary but for

14      Exhibit 3 filed at Camargo showing no father.

15      Correct?  Because after the marriage in '72,

16      your mother filed the new birth certificate in

17      Ojinaga.  Correct?

18  A.  Apparently.

19  Q.  Okay.  So unless you knew about this Camargo

20      birth certificate, there would have been no

21      reason, in your words, to have changed

22      documents when you were in high school.

23      Correct?

24  A.  I did not know about the existence of this

25      certificate.

1          MR. HOUGH:  Thank you.  No further

2     questions.

3          THE WITNESS:  And I just followed the

4     desires of my mother.

5          MR. HOUGH:  No further questions,

6     Judge.

7          THE COURT:  All right.  Is that--

8     does that take care of all of the testimony of

9     this witness?

10          MR. JONES:  Yes, it does.

11          THE COURT:  All right.  You may step

12     down.

13          (THEREUPON, the rebuttal testimony of

14          Special Agent Wayne Upton was not

15          ordered transcribed; WHEREUPON, the

16          following proceedings were had).

17          MR. JONES:  Can we-- can we have

18     surrebuttal?

19          THE COURT:  Say that again.

20          MR. JONES:  Can we have some

21     surrebuttal from-- from the Defendant?

22     Surrebuttal.

23          THE COURT:  Yes, you can.

24          MR. JONES:  Since we're almost there

25     and we-- we would have the-- we would be

1      through with the testimony by noon, I think.

2      No--

3                  THE COURT:  You may step down.  I

4      think he's talking about whether she can

5      testify.  She may do so.

6

7                  DIANA VELIA GUYTON,

8      recalled as a witness on behalf of the

9      Defendant, having been previously sworn, and

10     testified as follows:

11                 DIRECT EXAMINATION

12     BY MR. JONES:

13  Q.  Ma'am, you've heard what-- what Agent Upton

14     just finished saying.  Correct?

15  A.  Yes.

16  Q.  Is there a reason that you can do something--

17     that you can go further into the-- into the

18     interior of the country without a U.S. passport

19     and he can't?

20  A.  Yes.

21  Q.  How is it in March of-- of 2004 that you were

22     able to go past the 26-kilometer limit into the

23     country without a U.S. passport?

24                 (THEREUPON, the interpreter began

25     interpreting the question).

1      MR. JONES:  Kilometer.

2           (THEREUPON, the interpreter concluded

3      interpreting the question).

4  A.  Because when the Certificate of Citizenship of

5      the United States was accepted in the city of

6      Juarez, I never waived my citizenship, Mexican

7      citizenship.  And when citizenship-- American

8      citizenship is accepted, so I can-- so I

9      continue conserving both citizenships, which is

10     from Mexico.

11 Q.  So are you telling the Court that you have a

12     double citizenship?

13 A.  Yes, it is.  And it's always been that way ever

14     since that we travel from Ojinaga to the

15     interior of the country.

16 Q.  When you say we, who are you talking about?

17 A.  My brothers, Mother and I.  We would-- we would

18     just show our citizenship and we would show

19     either Certificate of Baptism or Certificate of

20     Birth, Mexican, or a identification that-- that

21     was taken place in Mexico, which could be the

22     voting registration card with a picture or any

23     kind of a-- voting with a picture or also from

24     school.

25 Q.  What did you show in 2004 when you crossed the

1    border into Mexico to go see your grandma?

2  A.  Birth certificate.

3              MR. JONES:  That's all the questions

4       I have.

5                   CROSS EXAMINATION

6  BY MR. HOUGH:

7  Q.  You submitted to the authorities that you were

8       an American citizen and submitted a Mexican

9       birth certificate; is that your testimony?

10  A.  My testimony, I have a dual citizenship.

11  Q.  Your testimony is that, presented at the border

12       in this matter March, 2004, you presented

13       yourself, a Mexican birth certificate and

14       claimed you were an American citizen traveling

15       in Mexico; is that correct?

16  A.  At crossing at the border, I only ask for a

17       vehicle permit--

18  Q.  Did you--

19  A.  -- to be able to go into the interior of the

20       country.

21  Q.  And that required what you are describing as

22       your Mexican birth certificate was all; is that

23       correct?

24  A.  To be able to gain the permit of the vehicle to

25       be able to go into the interior of the country,

1        the only thing I need to present is a title of

2        the vehicle and also the insurance of the

3        vehicle.

4    Q.  So this time in March of '04, you presented no

5        documents whatsoever and were going to cross

6        the border and did.  Correct?  Is that your

7        testimony?

8    A.  When I crossed the borderline in Ojinaga,

9        there's no need for that.

10   Q.  And that is called the Diana Guyton exception

11       to immigration law; is that what you're telling

12       us?

13   A.  There's-- there's no exception of no one and--

14       to be able to enter into the city of Ojinaga.

15   Q.  Thank you.

16              MR. HOUGH:  Nothing further.

17              THE COURT:  All right.  You may step

18       down.

19              (THEREUPON, the day's remaining

20           proceedings were not ordered

21           transcribed).

22

23

24

25

1    UNITED STATES OF AMERICA  )
                              )     ss:
2    DISTRICT OF KANSAS       )

3                    C E R T I F I C A T E

4         I, KELLI STEWART, Certified Shorthand

5    Reporter in and for the State of Kansas, do

6    hereby certify that I was present at and

7    reported in machine shorthand the proceedings

8    had the 29th day of August, 2006, in the

9    above-mentioned court; that the foregoing

10   transcript is a true, correct, and complete

11   transcript of the requested proceedings.

12        I further certify that I am not attorney

13   for, nor employed by, nor related to any of the

14   parties or attorneys in this action, nor

15   financially interested in the action.

16        IN WITNESS WHEREOF, I have hereunto set

17   my hand and official seal at Topeka, Kansas,

18   this _____ day of _____, 2006.

19

20

21                    /s/ Kelli Stewart_____

22                    KELLI STEWART

23                    Certified Shorthand Reporter

24

25